998 A.2d 472

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. EUGENE BASIL, A/K/A JEAN BASIL, DEFENDANT–RESPONDENT.

Argued February 23, 2010—Decided July 20, 2010.

Rabner, C.J., filed an opinion concurring in part and dissenting in part joined by Rivera-Soto and Hoens, JJ.

*Frank Muroski,* Deputy Attorney General, argued the cause for appellant (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Sylvia M. Orenstein,* Assistant Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Part III, joined by Justices LaVECCHIA and WALLACE.

In this appeal, the State claims that the Appellate Division erred in overturning defendant Eugene Basil's conviction of unlawful possession of a shotgun. This case involves two distinct constitutional issues, both arising from statements made by a young woman who refused to identify herself to police officers who were dispatched to the scene on the report of a man with a gun. The young woman identified defendant as the person who earlier had pointed a shotgun at her and directed the officers to the location of the discarded shotgun.

The first issue is whether the police had probable cause to arrest defendant. The Appellate Division concluded that defendant's arrest violated the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution and, accordingly, suppressed an incriminating statement made by defendant to police after his arrest. We conclude that the on-scene identification by a citizen informant and corroborative discovery of the shotgun gave the officers probable cause to arrest defendant, and therefore defendant's volunteered statement should not have been suppressed as the product of an unlawful arrest. We therefore reverse the Appellate Division's suppression of defendant's incriminating statement to the police.

The second issue is whether the admission of the young woman's statement at trial violated defendant's right of confrontation guaranteed by the Sixth Amendment to the United States Constitution. Because the police did not secure the woman's name and address, she could not be called as a witness at trial. Her identification of defendant as the person wielding the shotgun—the critical piece of the State's case—was introduced through the testimony of two police officers. The Appellate Division determined that the woman's hearsay statement was testimonial and defendant had never been given the opportunity to cross-examine her, and thus the admission of the statement violated the com-

mands of *Crawford v. Washington*, 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), and *Davis v. Washington*, 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006). The appellate panel essentially found that the out-of-court statement was testimonial because at the time the unidentified woman made the statement to the police she was not witnessing or experiencing the type of ongoing emergency, as illustrated in *Davis*, that would provide an exception to the constitutional right of confrontation. *Davis, supra,* 547 *U.S.* at 827–28, 126 *S.Ct.* at 2276–77, 165 *L.Ed.*2d at 240–41. Three members of the Court agree that the woman's hearsay statement was testimonial and inadmissible, and three members do not.[1] Because the admission of the statement could not be harmless beyond a reasonable doubt, *see State v. Macon*, 57 *N.J.* 325, 340, 273 *A.*2d 1 (1971), the judgment of the Appellate Division reversing defendant's conviction is affirmed by an evenly divided Court.

I.

A.

Defendant was charged by a Hudson County grand jury in a two-count indictment with second-degree possession of a shotgun with the purpose to use it unlawfully against the person or property of another, *N.J.S.A.* 2C:39–4(a), and third-degree knowingly possessing the shotgun without having first obtained a firearms purchaser identification card, *N.J.S.A.* 2C:39–5(c)(1). In a pretrial motion, defendant claimed that the police did not have probable cause to arrest him and therefore subjected him to an unreasonable seizure in violation of his constitutional rights. He sought to suppress a statement that he allegedly made after he was taken into custody.

---

[1] Only six members of the Court sat on this case.

*Suppression Hearing*

At the suppression hearing, Officer Anthony Ruocco of the Jersey City Police Department testified that on February 12, 2005, at approximately 1:00 a.m., he and Officer William Sullivan, as well as other police units, responded to a report of a man with a shotgun at 199 Bidwell Avenue in Jersey City. On his arrival, Officer Ruocco observed approximately three black males, including defendant, in the area of 199 Bidwell Avenue and was approached by a young black woman. She looked to be eighteen- or nineteen-years old, and "came from around the corner." The woman told Officer Ruocco that defendant had pointed a shotgun in her direction (she apparently was with a group of people), and that defendant uttered words to the effect of, "Get off the corner." She also stated that she saw defendant throw the shotgun underneath a black Cadillac. As the woman spoke to Ruocco, "she was shaking a little bit" and her "voice was elevated." Officers Sullivan and Chet Mecca then recovered the shotgun from underneath the Cadillac.

After Officer Ruocco arrived at the scene, officers approached and questioned defendant about the report of the shotgun. Following the young woman's statement and the discovery of the shotgun, defendant was placed in the back of a police car.

The young woman told Officer Ruocco that she lived in the area but nothing else about herself. She said she did not want to speak with any detectives or become involved in the case "because she was scared for her safety." Officer Ruocco did not get her name, address, or telephone number. The young woman just "left [and] walked away."

Officer Ruocco transported defendant in the backseat of a patrol car to the district police station. Officer Ruocco did not consider defendant to be under arrest at that point; however, if defendant had refused to go, he would have placed him under arrest for obstruction. At the police station, Officer Ruocco escorted defendant from the car. Once inside the station, according to Ruocco, defendant commented to him, "What the problem, you guys don't

do your job. So I went inside and got my shotgun." At that point, Ruocco placed defendant under arrest, handcuffed him, and gave him the *Miranda* warnings.[2]

Defendant testified, presenting a different account from the one described by the nameless witness and Officer Ruocco. Defendant explained that on the night in question he was involved in activities related to his grandmother's recent death. That evening, he had gone to church and brought food to his home at 204 Bidwell Avenue, where family and friends were gathering. At the time the police arrived, he was standing outside his home. A police officer approached him and asked him if "anything [was] going on." Later, an officer told him he was "under arrest for having a gun." He then was handcuffed and taken to the police precinct. Defendant denied possessing the shotgun found under the Cadillac, pointing that weapon at anyone, or making the incriminating statement attributed to him by Officer Ruocco.

The court found Officer Ruocco's credibility "to be excellent." The court concluded that the police engaged in a lawful investigative detention based on the statement of the citizen informant and the discovery of the shotgun. It further determined that based on defendant's "spontaneous" admission to possessing the shotgun, the police had probable cause to arrest him. Accordingly, the court denied the motion to suppress defendant's incriminating statement.

### The Trial

After jury selection, defendant challenged the admissibility of the non-appearing woman's statement to Officer Ruocco—identifying defendant as the person wielding the shotgun—on hearsay and confrontation grounds.[3] The court determined that the statement

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[3] Although defendant did not specifically mention the *Crawford* decision, he directly objected to the admission of the woman's out-of-court statement as a violation of his constitutional right to confrontation.

was admissible under the excited-utterance exception to the hearsay rule, *N.J.R.E.* 803(c)(2).[4]

At trial, the State presented three witnesses. Officer Ruocco testified that he and Officer Sullivan were dispatched to the area of 199 Bidwell Avenue in Jersey City on the report of a man with a shotgun. On their arrival, defendant was standing in front of 199 Bidwell Avenue. While Officer Sullivan "was holding [defendant]," Officer Ruocco was approached by an eighteen- or nineteen-year-old black woman who "came from around the corner." She told the officer that she was standing on the corner (apparently with others) when defendant "pointed a shotgun at their direction and stated get off the corner." She also "stated that the shotgun was thrown under a black Cadillac."[5]

Officer Sullivan gave a somewhat different account. Officer Sullivan testified that after he and Officer Ruocco arrived at the scene, a black female walked across the street and approached him. She said, "[T]hat's him," pointing to defendant, "he's the one with the gun." The two officers then told defendant to halt, and he replied, "What do you want me for?" Simultaneously, the woman advised the officers that the gun was underneath a black Cadillac. With Officer Ruocco in control of defendant—ten feet from the Cadillac—and the arrival of another police car, Officer Sullivan retrieved the unloaded shotgun from underneath the car.

According to Officer Sullivan, the woman stated that she did not want to be a witness, and therefore he did not get her name. Fearing that people on the street might become disruptive, Officers Sullivan and Ruocco immediately transported defendant to

---

4 Over defendant's objection, the court also allowed testimony regarding the anonymous 9–1–1 call about a man with a shotgun at 199 Bidwell Avenue. The court stated that the information received from the call was not hearsay because it was presented to explain why the police went to the scene, and not for whether the information was in fact true. The correctness of this ruling is not at issue on this appeal.

5 The rest of Officer Ruocco's testimony is essentially consistent with his testimony at the suppression hearing.

the district police station. Officer Sullivan explained that the shotgun was not dusted for fingerprints because of defendant's reported admission to Officer Ruocco. However, Officer Sullivan testified that in his presence defendant denied owning or having anything to do with the shotgun.

Last, Detective Daniel Diaz of the Hudson County Prosecutor's Office testified that the shotgun recovered under the Cadillac was operable.

Defendant presented two witnesses, both friends, Tarieka Hatcher and Vladimir Thomas. Ms. Hatcher, a postal employee, testified that on the evening in question she met defendant and his friend, Vladimir Thomas, at a bar. Defendant had attended a funeral earlier in the day. They carried out champagne to bring to defendant's home near the corner of Bidwell Avenue and Martin Luther King Drive, where a number of people were on the street. She was in close proximity to defendant, near his home on Bidwell Avenue, until the time of his arrest. She never saw him in possession of a shotgun.

Mr. Thomas, a carpenter, testified that on February 12, 2005, he too was in the company of defendant, first at the funeral, later at the bar, and afterwards in front of defendant's home on Bidwell Avenue. He described the "area [as] a drug corner." He recalled that he was in defendant's presence on Bidwell Avenue for all but the few minutes he was inside a nearby food store. As he left the store, he observed the police handcuffing defendant. At no point did he see defendant in possession of a shotgun.

At the trial's conclusion, the jury found defendant guilty of third-degree knowingly possessing a shotgun without first having obtained a firearms purchaser identification card.[6] The trial court sentenced defendant to an extended term of imprisonment, impos-

---

[6] Before the conclusion of the trial, the court granted the State's motion to dismiss the charge of second-degree possession of a shotgun with the purpose to use it unlawfully against the person or property of another, *N.J.S.A.* 2C:39–4(a).

ing a ten-year term with a five-year period of parole ineligibility.[7] *See N.J.S.A.* 2C:43-7 and 2C:44-3(a).

### B.

The Appellate Division reversed defendant's conviction, finding two separate grounds of error. First, the appellate panel determined that, for purposes of the Fourth Amendment, the warrantless detention of defendant, near his home, was the equivalent of an arrest and had to be supported by probable cause. Relying largely on *Florida v. J.L.,* 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000), the panel found that the woman's accusation that defendant had pointed a shotgun at her, even though corroborated by the discovery of the gun where she said it was discarded, did not satisfy the constitutional standard for probable cause. It concluded that there was no "reason to believe" that the woman, "who refused to identify herself or give a statement, was speaking the truth." It conjectured that, under the circumstances, the woman's motive for identifying defendant might have been to "exact[ ] revenge upon or otherwise harass[ ] a seemingly innocent person." Having reasoned that defendant was unlawfully seized by the police, the panel then held that defendant's "alleged confession" was a direct result of the unconstitutional seizure and had to be suppressed.

The panel next determined that the woman's hearsay statement to Officers Ruocco and Sullivan—that defendant pointed a shotgun in her direction, told the group she was with to get off the corner, and discarded the weapon under a Cadillac—was introduced in violation of the Confrontation Clause of the Sixth Amendment, as construed by *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), *Davis v. Washington,* 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006), and this Court's recent decision

---

[7] At the sentencing, defendant also pled guilty to bail jumping, *N.J.S.A.* 2C:29-7. On that charge, defendant was sentenced to a concurrent five-year term with a two-and-a-half-year period of parole ineligibility.

in *State ex rel. J.A.,* 195 *N.J.* 324, 949 *A.*2d 790 (2008). The panel noted that, under the United States Supreme Court's Confrontation Clause jurisprudence, a testimonial hearsay statement is inadmissible "unless there is a showing that the declarant is unavailable, and that the defendant had a previous opportunity for cross-examination." (Citing *Crawford, supra,* 541 *U.S.* at 68, 124 *S.Ct.* at 1374, 158 *L.Ed.*2d at 203). The panel applied the facts to *Davis*'s definition of a testimonial statement—a statement given to the police when there was no "ongoing emergency" and where the primary purpose of the police questioning was to "prove past events potentially relevant to [a] later criminal prosecution." (Quoting *Davis, supra,* 547 *U.S.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237). In particular, the panel held that the woman's hearsay statement was made when the suspect no longer possessed the weapon or posed a danger and "for the purpose of identifying defendant to the police so that he could be subject to criminal prosecution." [8]

"Because the tipster's statements constituted the sole remaining evidence of defendant's guilt," the panel reversed his conviction for unlawful possession of a weapon.

## C.

The State filed a petition for certification raising two distinct issues. The first issue is whether the police had probable cause to arrest defendant. The second issue is whether the non-testifying woman's statement to the police, implicating defendant in a crime, was a testimonial statement as defined in *Davis* and therefore barred by the Sixth Amendment's Confrontation Clause.[9]

---

[8] In contrast, the panel deemed the statements made during the 9–1–1 call to be nontestimonial because those statements were "elicited to permit the police to respond to an emergency." The admissibility of the 9–1–1 call is not at issue in this appeal.

[9] The admission of the woman's statement under the excited-utterance exception to the hearsay rule, *N.J.R.E.* 803(c)(2), was not challenged in this appeal.

We granted certification. *State v. Basil,* 200 *N.J.* 475, 983 *A.*2d 201 (2009).

## II.

The Appellate Division concluded that defendant was the subject of an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution and therefore suppressed the alleged statement made by defendant while in police custody.[10] The key issue is whether the warrantless arrest of defendant was constitutionally permissible.

## A.

The Fourth Amendment permits a police officer to make a warrantless arrest of a defendant in a public place provided the officer has probable cause to believe the defendant committed a crime. *See Maryland v. Pringle,* 540 *U.S.* 366, 370, 124 *S.Ct.* 795, 799, 157 *L.Ed.*2d 769, 774 (2003).[11] Probable cause is the touchstone for determining the validity of the arrest in this case.

The Appellate Division did not address the excited-utterance issue. Moreover, defendant did not file a cross-petition taking issue with the trial court's finding that the woman's statement was an excited utterance. Because the question of the admissibility of the woman's statement as an excited utterance is not before us, we do not address it.

10 In conducting its analysis, the Appellate Division made no distinction between the federal and state constitutional provisions.

11 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." *U.S. Const.* amend. IV. The Fourth Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio,* 367 *U.S.* 643, 655, 81 *S.Ct.* 1684, 1691, 6 *L.Ed.*2d 1081, 1090 (1961). Article I, Paragraph 7 of our State Constitution is similarly worded to the Fourth Amendment. We have, at times, construed Article I, Paragraph 7 to provide greater privacy protections to our citizens. *See State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987).

■ Probable cause cannot be defined with scientific precision, *State v. Evers*, 175 *N.J.* 355, 381, 815 *A.*2d 432 (2003), because it is a " 'practical, nontechnical conception' " addressing " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 *U.S.* 213, 231, 103 *S.Ct.* 2317, 2328, 76 *L.Ed.*2d 527, 544 (1983) (quoting *Brinegar v. United States*, 338 *U.S.* 160, 175–76, 69 *S.Ct.* 1302, 1310–11, 93 *L.Ed.* 1879, 1890–91 (1949)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra,* 462 *U.S.* at 232, 103 *S.Ct.* at 2329, 76 *L.Ed.*2d at 544. Although probable cause is more than a mere suspicion of guilt, it is less than the evidence necessary to convict a defendant of a crime in a court of law. *See Brinegar, supra,* 338 *U.S.* at 175, 69 *S.Ct.* at 1310, 93 *L.Ed.* at 1890; *State v. Davis,* 50 *N.J.* 16, 23–24, 231 *A.*2d 793 (1967), *cert. denied,* 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.*2d 852 (1968). Between those two extremes, it is safe to say that a police officer has probable cause to arrest a suspect when the officer possesses "a well grounded suspicion that a crime has been or is being committed." *State v. Sullivan,* 169 *N.J.* 204, 211, 777 *A.*2d 60 (2001) (citation and internal quotation marks omitted); *Brinegar, supra,* 338 *U.S.* at 175, 69 *S.Ct.* at 1310, 93 *L.Ed.* at 1890 ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." (citations and internal quotation marks omitted)).

■ In determining whether there was probable cause to make an arrest, a court must look to the totality of the circumstances, *Gates, supra,* 462 *U.S.* at 238, 103 *S.Ct.* at 2332, 76 *L.Ed.*2d at 548; *State v. Moore,* 181 *N.J.* 40, 46, 853 *A.*2d 903 (2004), and view those circumstances "from the standpoint of an objectively reasonable police officer," *Pringle, supra,* 540 *U.S.* at 371, 124 *S.Ct.* at 800, 157 *L.Ed.*2d at 775 (quoting *Ornelas v. United States,* 517 *U.S.* 690, 696, 116 *S.Ct.* 1657, 1661–62, 134 *L.Ed.*2d 911, 919 (1996)). In assessing the facts available to a

police officer, important considerations are the witness's veracity, reliability, and basis of knowledge. *See Gates, supra,* 462 *U.S.* at 233, 238, 103 *S.Ct.* at 2329, 2332, 76 *L.Ed.*2d at 545, 548.

Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster. *See State v. Amelio,* 197 *N.J.* 207, 212, 962 *A.*2d 498 (2008), *cert. denied,* —— *U.S.* ——, 129 *S.Ct.* 2402, 173 *L.Ed.*2d 1297 (2009). Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information. *See State v. Stovall,* 170 *N.J.* 346, 362, 788 *A.*2d 746 (2002). Our courts have distinguished between an identifiable citizen, who is presumed to be reliable, and an anonymous informer whose reliability must be established. *State v. Davis,* 104 *N.J.* 490, 506, 517 *A.*2d 859 (1986). The distinction is "grounded in common experience" because we assume that an ordinary citizen "is motivated by factors that are consistent with law enforcement goals." *Ibid.* The distinction is also grounded in common sense. "[W]hen a tip is made in-person, an officer can observe the informant's demeanor and determine whether the informant seems credible enough to justify immediate police action without further questioning." *United States v. Palos–Marquez,* 591 *F.*3d 1272, 1275 (9th Cir.2010). Moreover, "an in-person informant risks losing anonymity and being held accountable for a false tip." *Ibid.; see also N.J.S.A.* 2C:28–4(a) ("A person who knowingly gives or causes to be given false information to any law enforcement officer with purpose to implicate another commits a crime of the fourth degree.").

We now apply those principles to the relevant facts to determine whether defendant's "seizure" ran afoul of the federal and state constitutions.

## B.

Officer Ruocco—whose credibility the trial court found to be excellent—testified that he responded to 199 Bidwell Avenue

based on a dispatcher's report of a man with a shotgun.[12] On his arrival at the scene, he was approached by a young black woman, who had come from around the corner. She told the officer that defendant, who was standing nearby, had pointed a shotgun at her, that he had told her and the group she was with to "get off the corner," and that he had thrown the shotgun underneath a black Cadillac. The young woman was an identifiable citizen and purported to give information from her personal knowledge regarding events that occurred minutes earlier. This was a face-to-face encounter that allowed the officer to make an on-the-spot credibility assessment of the citizen informant. Importantly, the young woman's reliability was immediately corroborated by the discovery of the shotgun in the precise location where she said it was discarded. *See Gates, supra,* 462 *U.S.* at 241–42, 103 *S.Ct.* at 2334, 76 *L.Ed.*2d at 550–51 ("recogniz[ing] the value of corroboration of details of an informant's tip").

That the young woman would later refuse to give any identifying data about herself out of an expressed fear for her safety does little to diminish the reliability of the information when it was given. The young woman could not have known when she provided the information to Officer Ruocco that he would not take her into custody as a material witness, *N.J.S.A.* 2C:104-2, –5, or later seek her out to involve her in the case.

From the standpoint of an objectively reasonable police officer, the combination of an identifiable citizen's account of events that she witnessed firsthand minutes earlier and the discovery of corroborative physical evidence—the shotgun with which she was purportedly threatened—in the location she described provided probable cause to arrest defendant.

---

[12] "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" *State v. Elders,* 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) (citations omitted). We have no basis to overturn the trial court's finding that Officer Ruocco's testimony was credible.

This case is not like *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000), which was heavily relied on by the Appellate Division. In *J.L.*, the police received an anonymous call alleging that a young black male wearing a plaid shirt was standing at a particular bus stop armed with a gun. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258–59. Two police officers were dispatched to the bus stop and observed J.L., a young black male wearing a plaid shirt, and two other black males standing there. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259. The officers did not observe the three engaged in any "illegal conduct" or "threatening or otherwise unusual movements"; nor did they notice the presence of a firearm. *Ibid.* The officers frisked all three and found a gun in J.L.'s pocket. *Ibid.* J.L was charged with "carrying a concealed firearm without a license and possessing a firearm while under the age of 18." *Id.* at 269, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259.

The United States Supreme Court concluded that the search violated the Fourth Amendment and therefore upheld the suppression of the gun. *Id.* at 269, 274, 120 *S.Ct.* at 1377–78, 1380, 146 *L.Ed.*2d at 259, 262. The Court determined that the "anonymous tip" lacked the requisite indicia of reliability necessary to justify a stop and frisk because "[a]ll the police had to go on ... was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *Id.* at 271, 274, 120 *S.Ct.* at 1379, 1380, 146 *L.Ed.*2d at 260, 262.

 Although *J.L.* involved a *Terry*[13] stop and frisk, which requires only that a police officer have a reasonable and articulable suspicion to conduct a limited search, *Illinois v. Wardlow*, 528 *U.S.* 119, 123–24, 120 *S.Ct.* 673, 675–76, 145 *L.Ed.*2d 570, 576 (2000), the case before us involves dramatically different facts that clearly provided the police with probable cause to arrest. Here, unlike *J.L.*, the police dealt with a citizen informant, who reported

---

[13] *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

that a shotgun had been pointed at her, who provided the basis of her knowledge, and who directed the officer to the location of the gun. Based on the totality of the circumstances, the police had a well-grounded suspicion that defendant had committed a crime.

We conclude that, under both the Fourth Amendment and Article I, Paragraph 7 of our State Constitution, the police had probable cause to arrest defendant, and therefore defendant's alleged spontaneous admission to Officer Ruocco did not occur during an unlawful seizure. Given our holding it makes little difference whether one characterizes defendant's custodial status as an investigative detention, as did the trial court, or the equivalent of an arrest, as did the Appellate Division. We note, however, that the police detained defendant, who was standing in front of his home, placed him in a patrol car against his will, and transported him to a local police precinct "for further investigation." The degree of the restraint on defendant's freedom constituted, for Fourth Amendment purposes, an arrest, triggering the probable-cause requirement.[14] *Cf. Hayes v. Florida,* 470 *U.S.* 811, 816, 105 *S.Ct.* 1643, 1647, 84 *L.Ed.*2d 705, 710 (1985) (holding that police cannot "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes" without probable cause).

We next must decide whether the introduction of the young woman's hearsay statement to the police implicating defendant in a crime violated defendant's Sixth Amendment right to confront the witnesses against him.

### III.

The young woman's out-of-court statement identifying defendant as the gunman was the critical piece of evidence in determin-

---

[14] We reach the same result under Article I, Paragraph 7 of our State Constitution.

ing whether defendant was guilty of unlawfully possessing the shotgun. She was not called as a witness, presumably because she was "unavailable" due to the State's inability to locate her. The police officers at the scene allowed her to leave without obtaining any identifying information because she expressed fear for her safety. Moreover, defendant never had a prior opportunity to cross-examine her.

The essential issue that divides defendant and the State is whether the woman's account to the police was a testimonial or nontestimonial statement. If the statement was testimonial, it is inadmissible because defendant had no prior opportunity to cross-examine the woman. If the statement was nontestimonial, it is admissible because the constitutional right to confrontation does not apply to a nontestimonial statement that falls within a recognized hearsay exception, e.g., the excited-utterance exception, *N.J.R.E.* 803(c)(2).

We now turn to the precise issue raised in the State's petition—whether the unavailable witness's out-of-court statement was testimonial and therefore barred by the Sixth Amendment's Confrontation Clause.

### A.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."[15] Because "[t]he right of confrontation is an essential attribute of the right to a fair trial," a defendant must be given "a fair opportunity to defend against the State[']s accusations."

---

[15] The Sixth Amendment right to confrontation is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 *U.S.* 400, 406, 85 *S.Ct.* 1065, 1069, 13 *L.Ed.*2d 923, 927–28 (1965). *See also N.J. Const.* art. I, ¶ 10 ("In all criminal prosecutions the accused shall have the right ... to be confronted with the witnesses against him...."). No one has argued that our State Constitution would compel a different result than the federal Confrontation Clause.

*State v. Branch,* 182 *N.J.* 338, 348, 865 *A.*2d 673 (2005) (citations and internal quotation marks omitted). For that reason, the Sixth Amendment right of confrontation "expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination." *State ex rel. J.A.,* 195 *N.J.* 324, 342, 949 *A.*2d 790 (2008). Our legal system has long recognized that cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (citation and internal quotation marks omitted).

In *Crawford v. Washington,* the United States Supreme Court declared that the Sixth Amendment's Confrontation Clause prohibited the use of an out-of-court testimonial statement against a criminal defendant unless the witness was unavailable and the defendant was given a prior opportunity to cross-examine her. 541 *U.S.* 36, 50–53, 68, 124 *S.Ct.* 1354, 1363–65, 1374, 158 *L.Ed.*2d 177, 192–94, 203 (2004); *see also State v. Buda,* 195 *N.J.* 278, 283–84, 949 *A.*2d 761 (2008). An out-of-court testimonial statement is the equivalent of "bear[ing] testimony" against an accused. *Crawford, supra,* 541 *U.S.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192–93 (citation and internal quotation marks omitted). The Court made clear that the ultimate goal of the Confrontation Clause is to test the reliability of testimonial evidence in "the crucible of cross-examination." *Id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199; *see also J.A., supra,* 195 *N.J.* at 342–43, 949 *A.*2d 790. The Court reasoned that the Clause "reflects a judgment, not only about the desirability of reliable evidence . . ., but about how reliability can best be determined." *Crawford, supra,* 541 *U.S.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199.

Thus, the Confrontation Clause proscribes "the use of out-of-court *testimonial* hearsay, untested by cross-examination, as a substitute for in-court testimony." *J.A., supra,* 195 *N.J.* at 342, 949 *A.*2d 790. Out-of-court statements interdicted by the Confrontation Clause include both testimonial statements elicited by the police during interrogations, *see Crawford, supra,* 541 *U.S.*

at 51–52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 193, and testimonial statements volunteered to the police, *see Davis v. Washington*, 547 *U.S.* 813, 822 n.1, 126 *S.Ct.* 2266, 2274 n.1, 165 *L.Ed.*2d 224, 237 n. 1 (2006).[16] A statement about a relevant past event made to a police officer conducting a criminal investigation meets the Sixth Amendment's formality and solemnity requirement for a testimonial statement. *Crawford, supra,* 541 *U.S.* at 51–52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192–93; *Davis, supra,* 547 *U.S.* at 826, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240 (noting that solemnity requirement satisfied by criminal penalties for making "a deliberate falsehood" to law enforcement).

■ *Crawford* did not bar the use of all hearsay at trial. Out-of-court nontestimonial statements, although subject to a State's hearsay rules, were "exempted ... from Confrontation Clause scrutiny." 541 *U.S.* at 68, 124 *S.Ct.* at 1374, 158 *L.Ed.*2d at 203. The Crawford Court left for another day a more "comprehensive definition of 'testimonial.' " *Ibid.*

■ That day came two years later. In the companion cases of *Davis v. Washington* and *Hammon v. Indiana,* the Supreme Court applied the principles of *Crawford* and defined in greater detail the distinction between nontestimonial and testimonial statements. 547 *U.S.* 813, 822, 126 *S.Ct.* 2266, 2273–74, 165 *L.Ed.*2d 224, 237 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Ibid.*

---

16 With respect to volunteered statements, the United States Court of Appeals for the Sixth Circuit has noted:

> [T]he danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation. One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation.

> [*United States v. Cromer*, 389 *F.*3d 662, 675 (6th Cir.2004).]

In contrast, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Ibid.*

The Court illustrated the application of those definitions in *Davis* and *Hammon.* In *Davis,* the victim made a telephone call to 9–1–1 and spoke to an emergency operator while her former boyfriend—the defendant—was beating her. *Id.* at 817–18, 126 *S.Ct.* at 2270–71, 165 *L.Ed.*2d at 234. The victim identified her assailant to the operator as the domestic violence was ongoing. *Id.* at 818, 126 *S.Ct.* at 2271, 165 *L.Ed.*2d at 234. During the 9–1–1 call the defendant fled from the victim's home. *Ibid.* Within four minutes of the 9–1–1 call, the police arrived, observing the victim's "shaken state" and physical injuries to her body. *Id.* at 818, 126 *S.Ct.* at 2271, 165 *L.Ed.*2d at 235. At trial, the victim did not testify, but her statements to the 9–1–1 operator were admitted as the primary evidence against the defendant. *Id.* at 818–19, 126 *S.Ct.* at 2271, 165 *L.Ed.*2d at 235.

The Court determined that the statements made by the victim to the 9–1–1 operator were nontestimonial for among the following reasons: (1) the statements were elicited "to resolve the present emergency, rather than simply to learn ... what had happened in the past"; (2) the victim "was speaking about events as they were actually happening, rather than 'describ[ing] past events' "; and (3) the victim's "call was plainly a call for help against a bona fide physical threat." *Id.* at 827–28, 126 *S.Ct.* at 2276–77, 165 *L.Ed.*2d at 240 (citations and emphasis omitted). Viewed objectively, the operator's questioning of the victim "indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 240.

Importantly, in *Davis,* the Court noted that once "the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended," and therefore "[i]t could readily be maintained" that the victim's statements

after the defendant's flight were testimonial. *Id.* at 828–29, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 241. Through an in limine procedure, the Court instructed, portions of a statement that are testimonial should be redacted from those portions that are otherwise nontestimonial. *Id.* at 829, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 241.

In stark contrast stand the facts in *Hammon.* There, the police responded to the scene of a "reported domestic disturbance"—the home of the wife/victim and her husband/defendant. *Id.* at 819–20, 126 *S.Ct.* at 2272, 165 *L.Ed.*2d at 235–36. By the time the police arrived, the domestic-violence incident was over. *Ibid.* The police separated the victim from her husband, and then the wife gave a statement to the police describing what had occurred. *Ibid.* She also detailed the domestic violence incident in a "battery affidavit." *Ibid.* The victim did not appear at the defendant's trial, but her statement to the police and her battery affidavit were introduced against him. *Id.* at 820–21, 126 *S.Ct.* at 2272–73, 165 *L.Ed.*2d at 236.

The Court concluded that the victim's statement to the police and in the affidavit describing the domestic-violence events were testimonial for among the following reasons: (1) the police interrogation of the victim "was part of an investigation into possibly criminal past conduct"; (2) the police inquiry was not an effort to determine " 'what [was] happening,' but rather 'what happened' "; and (3) "there was no immediate threat" to the victim because she had been separated from her abuser and therefore "no emergency [was] in progress." *Id.* at 829–30, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime...." *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. Unlike in *Davis,* in which the victim's statement to the 9–1–1 operator was "a call for help," *id.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240, the statement in *Hammon* was a recounting of past events and thus "an obvious substitute for live testimony," *id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242.

We applied the principles enunciated in *Crawford* and *Davis* in *J.A., supra,* 195 *N.J.* at 347–51, 949 *A.2d* 790. In that case, we held that a non-testifying witness's statement to the police, recounting a robbery and the flight of the perpetrators that occurred several minutes before the witness gave the statement, was clearly testimonial and therefore inadmissible because defendant "did not have a prior opportunity to cross-examine [him]." *Id.* at 347–48, 949 *A.2d* 790. We found the case analogous to *Hammon,* as "[t]here was no ongoing emergency—no immediate danger—implicating either the witness or the victim, both of whom were in the company of police officers at the time of the 'interrogation.'" *Id.* at 348, 949 *A.2d* 790. The primary purpose of the interrogation of the witness in *J.A.* was "to establish or prove past events potentially relevant to [a] later criminal prosecution." *Id.* at 350, 949 *A.2d* 790 (alteration in original) (citation and internal quotation marks omitted). Thus, we distilled from Davis that a non-appearing witness's "narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is testimonial." *Id.* at 348, 949 *A.2d* 790 (citation omitted).

Courts have given varied interpretations to the ongoing-emergency language of *Davis.* Some courts have narrowly construed an "ongoing emergency" to cases involving a "bona fide physical threat" requiring help, reasoning that "[i]f merely obtaining information to assist officers in the field renders the statements nontestimonial, then virtually any hearsay statements made by crime victims in response to police questioning would be admissible—a result that does not comport with *Crawford* and *Davis.*" *State v. Koslowski,* 166 *Wash.*2d 409, 209 *P.*3d 479, 486–89 (2009).[17]

---

[17] *See also Commonwealth v. Galicia,* 447 *Mass.* 737, 857 *N.E.*2d 463, 467, 470 (2006) (holding that victim's statements made to police officers, who arrived five minutes after she had placed 9-1-1 domestic-violence call, were testimonial because those "statements to officers occurred separate and apart from the danger she sought to avert, both temporally and physically"); *State v. Kirby,* 280 *Conn.* 361, 908 *A.2d* 506, 512–13, 522–23 & n.19 (2006) (holding that statements made by kidnapping victim to police dispatcher describing crime were testimoni-

In contrast, other courts have given the ongoing-emergency doctrine a more expansive interpretation.[18] Indeed, in *J.A., supra,* we noted that "[s]ome courts have held that after a shooting or an offense involving a gun, the immediate threat of the armed suspect returning to the scene constitutes an ongoing emergency." 195 *N.J.* at 349 n.14, 949 *A.*2d 790 (citing *United States v. Arnold,* 486 *F.*3d 177 (6th Cir.2007) (en banc), *cert. denied,* 552 *U.S.* 1103, 128 *S.Ct.* 871, 169 *L.Ed.*2d 736 (2008); *State v. Ayer,* 154 *N.H.* 500, 917 *A.*2d 214 (2006), *cert. denied,* 552 *U.S.* 834, 128 *S.Ct.* 63, 169 *L.Ed.*2d 52 (2007); and *People v. Nieves–Andino,* 9 *N.Y.*3d 12, 840 *N.Y.S.*2d 882, 872 *N.E.*2d 1188 (2007)). As will be discussed in more detail later, that scenario is not present here.

## B.

 The government bears the burden of proving the constitutional admissibility of a statement in response to a Confrontation Clause challenge. *See Idaho v. Wright,* 497 *U.S.* 805, 816, 110

---

al because "the emergency" was over "and the complainant no longer was under any threat from the defendant"); *Wilder v. Commonwealth,* 55 *Va.App.* 579, 687 *S.E.*2d 542, 548 (2010) (rejecting argument "that any ongoing felony constitutes an 'emergency' for the purposes of any analysis under [*Davis v. Washington* ]").

18 *See, e.g., United States v. Dodds,* 569 *F.*3d 336, 340–41 (7th Cir.) (holding that unidentified person's statement to police describing man who had pointed gun at people two blocks away was nontestimonial because "the police were responding to a 911 call reporting 'shots fired' and had an urgent need to identify the person with the gun and to stop the shooting"), *cert. denied,* —— *U.S.* ——, 130 *S.Ct.* 523, 175 *L.Ed.*2d 370 (2009); *United States v. Proctor,* 505 *F.*3d 366, 368, 372 (5th Cir.2007) (holding that statements made to 9–1–1 operator were nontestimonial because man "reported that his brother had taken a gun, fired it twice into the ground, and that he believed [his brother] had run back into the nightclub"), *cert. denied,* 552 *U.S.* 1236, 128 *S.Ct.* 1457, 170 *L.Ed.*2d 285 (2008); *State v. Shea,* 184 *Vt.* 453, 965 *A.*2d 504, 505, 510–11 (2008) (concluding that initial statement to police by domestic-violence victim—who was "frantic, crying, bleeding from the nose and cut over her eye"—disclosing perpetrator's name was nontestimonial, but that after police "secured the scene and determined that the complainant did not need emergency medical treatment, [police] questioning of complainant obtained testimonial information").

*S.Ct.* 3139, 3147, 111 *L.Ed.*2d 638, 652–53 (1990), *abrogated on other grounds by Crawford, supra,* 541 *U.S.* at 67–68, 124 *S.Ct.* at 1373–74, 158 *L.Ed.*2d at 202–03; *Ohio v. Roberts,* 448 *U.S.* 56, 74–75, 100 *S.Ct.* 2531, 2543, 65 *L.Ed.*2d 597, 613 (1980), *overruled on other grounds by Crawford, supra,* 541 *U.S.* at 67–68, 124 *S.Ct.* at 1373–74, 158 *L.Ed.*2d at 202–03; *see also State v. Bentley,* 739 *N.W.*2d 296, 298 (Iowa 2007) ("[W]e conclude the government bears the burden of proving by a preponderance of the evidence that [a witness's] statements are nontestimonial."). Therefore, we must determine whether the State has met its burden. With *Crawford* and *Davis* as our backdrop, and mindful that the State bears the burden of establishing an exception to the constitutional right of confrontation, we now apply those legal principles to the facts of this case.

■ We conclude that the non-testifying witness's statement implicating defendant was testimonial, that is, the statement was the equivalent of bearing witness against defendant. Here, defendant was denied the opportunity of confronting his accuser. The State has not shown that this case presents the type of ongoing emergency, described in *Davis,* that would justify an end run around the Confrontation Clause.

It is undisputed that the police responded to 199 Bidwell Avenue on the report of a man with a shotgun. According to Officer Ruocco, Officer Sullivan was "holding" defendant, who was standing in front of 199 Bidwell, when the young woman came from around the corner and approached Officer Ruocco. She identified defendant as the person who, earlier, had pointed a shotgun at her and told her, and apparently others in her group, to get off the corner. She also told the officers that defendant had thrown the shotgun under a Cadillac. With defendant already detained, the police retrieved the shotgun.

According to Officer Sullivan, after his arrival at the scene, along with Officer Ruocco, the woman crossed the street and approached him. She said, "[T]hat's him," pointing to defendant,

"he's the one with the gun." (She obviously knew that defendant was not armed with the shotgun because she directed the police to the gun's location). The two officers then told defendant to halt, and he replied, "What do you want me for?" Simultaneously, the woman advised the officers that the gun was underneath a black Cadillac. With Officer Ruocco in control of defendant—ten feet from the Cadillac—and the arrival of another police car, Officer Sullivan retrieved the unloaded shotgun from underneath the car.

To be sure, there were some differences in the testimony presented by Officers Ruocco and Sullivan, but none that would change the outcome of our analysis. In both accounts, the witness *returned* to the scene—after she saw the presence of the police—to assist in an investigation into past criminal conduct. *See Davis, supra,* 547 *U.S.* at 829–30, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. This was not a cry for help as in Davis in which an assault against the witness was ongoing. *Id.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240. In both accounts, the witness knew that the shotgun was under the Cadillac when she spoke with the officers. In both accounts, like in *Hammon,* the witness was separated from defendant. *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. Given Officer Ruocco's testimony, when the witness spoke to him, she apparently could see that an officer was "holding" defendant and knew that the shotgun was under the Cadillac, and therefore "there was no immediate threat" to her or the police. *Ibid.* Even Officer Sullivan's testimony does not suggest that the woman had an objective reason to fear an imminent attack: as she spoke to the police, she was separated from defendant, the shotgun was under a car and away from defendant, and the police were close to defendant.

Whatever differences there may be between the testimony of Officers Ruocco and Sullivan, the State bore the burden of proof and cannot now repudiate its key witness, Officer Ruocco, who testified both at the suppression hearing and at trial, and whose credibility at the suppression hearing the trial court found to be

excellent.[19] It was Officer Ruocco—not Officer Sullivan—to whom the woman stated that defendant had earlier pointed a shotgun at her. When she made that statement to Officer Ruocco, the witness was relating "what happened," and therefore recounting past events—"an obvious substitute for live testimony," as in *Hammon*. *Ibid.* Thus, unlike the factual scenario in *Davis*, the witness here, in describing the earlier gun-pointing incident, was not "speaking about events as they were actually happening" or "call[ing] for help against a bona fide physical threat." *See id.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240 (emphasis omitted). All in all, "the primary ... purpose of the interrogation was to investigate a possible crime," *id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242, and therefore the non-testifying witness's statement about how she was threatened with a gun was testimonial and inadmissible.

*State v. Lopez*, 974 *So.*2d 340 (Fla.2008), provides a scenario strikingly similar to the facts before us. In *Lopez*, the police were dispatched to an apartment complex where the alleged victim told one officer that the defendant had attempted to abduct him at gunpoint. *Id.* at 343. The defendant was standing twenty-five yards away in a parking lot. *Id.* at 347. The victim told another officer that the gun used in the attempted abduction was still in the victim's car. *Id.* at 343. The police searched the car and found "a loaded .38 caliber Smith & Wesson revolver under the front passenger seat." *Ibid.* The police then advised the defendant of his rights and questioned him. *Ibid.* In determining that the victim's statement was testimonial, the Florida Supreme Court emphasized that the victim and his alleged abductor were separated from each other when the police arrived, the gun "present[ed] no immediate danger" because it was in the car, and the " 'pri-

---

[19] It bears noting that the trial court determined the admissibility of the unavailable woman's statement based on Officer Ruocco's suppression testimony. Both this opinion and the dissent rely on the trial testimony of both Officers Ruocco and Sullivan, and rightly so, because the constitutional admissibility of the woman's statement ultimately depended on the evidence presented at trial.

mary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* at 347 (citing *Davis, supra,* 547 *U.S.* at 822, 126 *S.Ct.* at 2274, 165 *L.Ed.*2d at 237).

On the other hand, this case is factually distinguishable from those relied on by the State in its petition. Those cases involve a witness contemporaneously identifying an armed man returning to the scene, who seemingly presents a dire threat to the public or police, *Arnold, supra,* 486 *F.*3d at 179–80,[20] a witness providing information about "an armed assailant, who had just shot an unarmed individual in public in broad daylight," and was on the loose, *Ayer, supra,* 917 *A.*2d at 225,[21] and a mortally wounded witness who provides information about the shooter, *Nieves–*

---

[20] In *Arnold, supra,* a non-testifying witness reported to a 9–1–1 emergency operator that her mother's boyfriend—the defendant—had pulled a gun on her in his house and that she then left and went around the corner. 486 *F.*3d at 179. When the police arrived, the witness, who was "hysterical" and "visibly shaken and upset," told the police that the defendant was armed and trying to kill her. *Id.* at 180. Shortly afterwards, the defendant was spotted in a car, and the witness anxiously exclaimed: "[T]hat's him, that's the guy that pulled the gun on me...." *Ibid.* A majority of the United States Court of Appeals for the Sixth Circuit, in a split decision sitting en banc, found the woman's statements to be nontestimonial on the ground that the police were responding to an ongoing emergency. *Id.* at 189–92. The majority compared the facts before it to those in *Davis. Ibid.* However, the 9–1–1 call in *Davis* related events as they were happening. As the dissent in *Arnold* highlights, the witness's statements all described past events, and therefore they were—in the dissent's view—testimonial in nature. *Id.* at 214–16 (Moore, J., dissenting).

[21] In *Ayer, supra,* the police responded to the scene of a shooting. 917 *A.*2d at 219. The victim later died from the gunshot wound. *Ibid.* At the scene, a police officer approached the defendant's wife, who blurted out information concerning the shooting. *Id.* at 220. In response to police questioning, she implicated her husband as the shooter. *Ibid.* The New Hampshire Supreme Court concluded that the wife's statements were elicited "to enable police assistance to meet an ongoing emergency" and therefore were nontestimonial. *Id.* at 225. In reaching its decision, the Court deemed it significant "that an armed assailant, who had just shot an unarmed individual in public in broad daylight, was loose, and could have remained in the immediate vicinity or could have gone elsewhere in search of other victims." *Ibid.*

*Andino, supra,* 872 *N.E.*2d at 1188–89.[22] Some of those cases have been decided by deeply split courts with the majority offering a questionable interpretation of *Crawford* and *Davis.* We need not pass on the merits of those cases because the facts before us do not address an on-the-loose gunman or a fatally wounded witness.[23]

To too broadly construe the definition of a nontestimonial statement for Sixth Amendment purposes would swallow the constitutional "preference for the in-court testimony of a witness," *J.A., supra,* 195 *N.J.* at 342, 949 *A.*2d 790, and eviscerate the procedural protections provided by the Confrontation Clause. We also should proceed with caution before finding an out-of-court statement to be nontestimonial when the statement is the critical piece of evidence in an identification case. The perils of identification testimony, even when the witness is subject to robust cross-examination, have been well documented.

---

[22] *Nieves–Andino* involved a victim who was shot three times and ultimately died of his injuries. 840 *N.Y.S.*2d 882, 872 *N.E.*2d at 1188–89. The police found the victim on a street, "bleeding and grimacing with pain." *Id.* at 1188. The victim identified the defendant as the shooter and gave the defendant's address to the police. *Id.* at 1189. In a split decision, the New York Court of Appeals determined that the victim's statements were nontestimonial. Four members of the Court reasoned that the police acted in response to an "ongoing emergency" and that the police officer's questions were "reasonable efforts to assess what had happened to cause [the victim's] injuries and whether there was any continuing danger to the others in the vicinity." *Id.* at 1190. Three members of the Court found that the victim's statements implicating defendant "were not elicited by an interrogation designed to assist [the officers] in meeting an ongoing emergency," but rather, "to establish or prove past events potentially relevant to a later criminal prosecution." *Id.* at 1191 (Jones, J., concurring).

[23] We note that the United States Supreme Court recently granted certiorari in *People v. Bryant,* 483 *Mich.* 132, 768 *N.W.*2d 65 (2009), *cert. granted,* — *U.S.* ——, 130 *S.Ct.* 1685, 176 *L.Ed.*2d 179 (March 1, 2010). In that case, the Michigan Supreme Court found that statements made by a mortally wounded witness to police identifying the defendant as the person who shot him thirty minutes earlier—admitted by the trial court as excited utterances—were testimonial. *Id.* at 67, 68 n.3, 71–74. Those facts are vastly different from those before us.

## C.

Identification was the paramount issue in this case, and yet the woman who witnessed the events was not in court to respond to the most basic questions concerning her credibility or the reliability of her observations. For example, we do not know how far the young woman was from defendant or how many other persons were on the street at the time she made her observations; the lighting conditions from her vantage point; the degree of her attentiveness; whether she had problems with her eyesight; or whether she had used alcohol or drugs, or had ulterior motives or even had a criminal record. *See generally State v. Madison*, 109 *N.J.* 223, 239–40, 536 *A.*2d 254 (1988) (noting factors to be considered in determining reliability of witness identification); Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 *Ann. Rev. Psychol.* 277, 280–85 (2003) (discussing factors which relate to accuracy of eyewitness identification). We will never know the answers to those significant questions because the woman was not presented as a witness at trial.

The concerns raised · here are important because eyewitness testimony, even when presented in court with the complete panoply of protections afforded by due process, is far from foolproof. Indeed, "[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country." *State v. Delgado*, 188 *N.J.* 48, 60, 902 *A.*2d 888 (2006). To open wide the door to hearsay identifications made by non-testifying witnesses might exponentially increase the likelihood of misidentifications. *Crawford* explains that the Confrontation Clause "reflects a judgment" that the right to confront and cross-examine one's accusers is the proper method to determine the reliability of evidence. 541 *U.S.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199. That right cannot be nullified unilaterally because the police allow a seemingly reluctant or even frightened witness to walk away.

It is understandable why the young woman (who was courageous enough to step forward) might not want to become a State's witness in a criminal prosecution—fear being one reason. It is

not understandable why police officers would not take the most elemental steps to preserve evidence for a future trial. One of the great challenges facing the law enforcement community is to persuade reluctant or frightened witnesses to testify. For the most part, the police and prosecutors do all within their means to bring their witnesses to court. That did not happen here.

A police officer is not helpless when a person, who claims to have witnessed a crime, refuses to provide her identification. Under such circumstances, the officer is empowered to take that person into custody as a material witness. *See N.J.S.A.* 2C:104–1 to –9. In most instances, the mere threat of possible arrest as a material witness should produce the necessary identification. Unfortunately, the Confrontation Clause issue here comes to us for no reason other than that the police chose not to determine the witness's identity.[24]

Condoning the practice would give a perverse incentive to the police not to obtain basic identifying information from its star witness. We cannot overlook the cost to the system of justice by the State's failure to take reasonable steps to produce the one witness whose testimony was critical to defendant's fate. Not securing the name and address of the State's key witness—but using the statement of that witness to convict the accused—makes hollow defendant's right of confrontation.

### D.

Our dissenting colleagues would remand to the trial court. *Infra* at 607, 998 *A.2d* at 493. However, a remand to the trial court to resolve the Confrontation Clause issue would serve little purpose at this point. Officers Ruocco and Sullivan gave their testimony in March 2006, recounting events from a year earlier—

---

[24] Failing to secure the woman's identification also denied defendant the opportunity to call her as a witness had he chosen to do so. *See U.S. Const.* amend. VI ("[T]he accused shall enjoy the right ... to have a compulsory process for obtaining witnesses in his favor....").

events that lasted minutes at most. A remand will not settle the conflict in their testimony, even if that conflict were meaningful. We must accept that they have different recollections.

The trial court found Officer Ruocco's testimonial credibility "excellent" at the suppression hearing. Officer Ruocco's trial testimony followed closely the testimony he gave at the suppression hearing. Given that background, we can hardly expect that the trial court would call into question the credibility of Officer Ruocco's trial testimony on the Confrontation Clause issue, or find that Officer Sullivan's more limited recollection is superior to that of Officer Ruocco's. To the extent that the characterization of the woman's statement as testimonial or nontestimonial depends on whether one believes Officer Ruocco or Officer Sullivan, the State cannot conceivably meet its burden of establishing an exception to the Confrontation Clause. The officers' testimony, taken together (conflicts and all), leads to one inescapable conclusion—the State has not met its constitutional burden. *See Wright, supra,* 497 *U.S.* at 816, 110 *S.Ct.* at 3147, 111 *L.Ed.*2d at 652–53.

■■■ At the suppression hearing, the State was content to live with Officer Ruocco's testimony, which is the basis for the denial of defendant's motion to suppress the shotgun. The State also must be content to live with his testimony as it relates to the Confrontation Clause issue. With the officers' recollections fixed, how would the trial court pick and choose between the fine distinctions in their accounts? Accepting the whole of the two officers' testimony, the State did not meet its burden of proving that the unavailable witness's statement was nontestimonial.[25] Exceptions to constitutional rights—including exceptions to the Confrontation Clause—must be narrowly drawn. *See, e.g., United States v. Benfield,* 593 *F.*2d 815, 821 (8th Cir.1979) (noting that

[25] It is not a double standard, as the dissent suggests, *infra* at 615, 998 *A.*2d at 498, for this Court to decide a constitutional question based on the record before it, and then, having decided that legal issue, to remand for a new trial.

"[a]ny exception [to the Confrontation Clause] should be narrow in scope and based on necessity or waiver").

We conclude that the non-appearing witness's testimonial statement was inadmissible. The admission of the statement had the clear capacity to cause an unjust result, *R.* 2:10–2, and was not harmless error beyond a reasonable doubt, *see Macon, supra,* 57 *N.J.* 325, 340, 273 *A.*2d 1 (1971) ("[A] new trial shall be ordered if there is a reasonable doubt as to whether the constitutional error contributed to the verdict."). Defendant's conviction, therefore, must be reversed and the matter remanded for a new trial.

## IV.

In conclusion, we reverse the part of the judgment of the Appellate Division that suppressed defendant's verbal admission to the police on the ground that defendant was arrested without probable cause. The judgment of the Appellate Division holding that the non-appearing witness's statement implicating defendant in a crime was a testimonial statement barred by the Sixth Amendment's Confrontation Clause is affirmed by an evenly divided Court. The Appellate Division's judgment is affirmed in part, reversed in part, and we remand to the trial court for proceedings consistent with this opinion.

Chief Justice RABNER, concurring in part and dissenting in part.

I agree with the majority's carefully reasoned conclusion that the police had probable cause to arrest defendant. The statement defendant volunteered afterward should therefore not have been suppressed, as the majority found.

As to the second issue presented, which addresses the admissibility of certain testimony under *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004),[1] the facts matter a

---

[1] Because the Court is evenly divided on this issue, there is no majority opinion on the point, and the Appellate Division's ruling stands.

great deal. The record before us offers two versions of what occurred in the minutes after an anonymous 9–1–1 call was placed to the Jersey City police at about 1:00 a.m. on February 12, 2005. The caller reported a male with a shotgun at 199 Bidwell Avenue. In one version, which my colleagues accept, the police arrived soon after the 9–1–1 call and secured the scene, thereby eliminating any ongoing danger posed by a shotgun on a public street. As a result, certain statements at the time by an unidentified woman would be testimonial and thus inadmissible under *Crawford*.

However, according to another version that is also based on testimony in the record, a visibly shaking woman approached two police officers immediately upon their arrival at the scene and told them defendant pointed a shotgun at her and told her to get off the corner. She also explained that defendant threw the shotgun underneath a nearby black Cadillac. During that brief discussion, the officers were with the woman, not the defendant. Only afterward did one of the officers head toward defendant and take control of him. From the moment the police arrived, one or two other males were also in the area.

In the latter version, the woman spoke to police when both the alleged assailant and his nearby shotgun were unsecured. On a public, city street at 1:05 a.m., with two or three people other than the police near the shotgun, the shotgun and its owner presented an ongoing emergency. Accordingly, the woman's excited utterances would be nontestimonial and admissible under *Crawford*.

Both versions of events are based on the trial testimony of the two officers on the scene. The trial judge made no factual findings about their relevant and apparent inconsistencies for good reason: no party raised any *Crawford* question at the trial level. The issue first surfaced in defendant's reply brief to the Appellate Division.

In reaching its decision on the *Crawford* issue, my colleagues, like the Appellate Division, found that all danger had passed by the time the woman spoke to the police. That pivotal factual finding should not be made by appellate court judges who did not

hear the live testimony presented. *See State v. Robinson,* 200 *N.J.* 1, 15, 974 *A.*2d 1057 (2009); *State v. Elders,* 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007). Instead, this case should be remanded to the trial court to make proper findings and analyze them under *Crawford* and its progeny. To the extent my colleagues take a different approach, I respectfully dissent.

## I.

Certain facts are not in dispute. An anonymous person placed a 9-1-1 call to the police and reported a male with a shotgun at 199 Bidwell Avenue in Jersey City. Officers Ruocco and Sullivan responded to the scene "probably [within] a couple of minutes" of getting the call. An unidentified woman who appeared to be about eighteen or nineteen years old walked right up to Officer Ruocco, pointed at defendant, and said that defendant had "pointed a shotgun at me" and "told us to get off the corner." She added that defendant had thrown the shotgun underneath a nearby black Cadillac. The frightened woman, who said she lived in the area and wanted no part of any police action out of fear for her safety, refused to give her name or a formal statement and left.

Ruocco described the woman at the pretrial hearing as follows: "[S]he was shaking a little bit. She was scared. And her tone of voice was elevated, too." At trial, Ruocco presented similar testimony: "She was shaking. She was pretty excited. She ha[d] a high tone of voice. She was scared."

Equipped with that information, the police then searched under the Cadillac and retrieved a shotgun. Soon after, the police transported defendant to a nearby police station.

Those facts provide sufficient support for the trial court's conclusion that the woman's statements were "excited utterances" within the meaning of *Rule* 803(c)(2). Defendant accepted that ruling and did not file a cross-petition challenging it.

Under *Rule* 803(c)(2), (1) "[a] statement relating to a startling event or condition," (2) "made while the declarant was under the stress of excitement caused by the event or condition," and (3) "without opportunity to deliberate or fabricate" is not excluded by the hearsay rule. *State ex rel. J.A.*, 195 *N.J.* 324, 340, 949 *A.2d* 790 (2008) (citing *State v. Branch*, 182 *N.J.* 338, 365, 865 *A.2d* 673 (2005)). To evaluate whether a statement qualifies as an "excited utterance," courts look to a number of factors:

(1) the amount of time that transpired between the initial observation of the event and the subsequent declaration of the statement; (2) the circumstances of the event; (3) the mental or physical condition of the declarant; (4) the shock produced; (5) nature of the statement; and (6) whether the statement was made voluntarily or in response to a question.

[*Buda, supra,* 195 *N.J.* at 294, 949 *A.2d* 761 (citation omitted).]

In light of those factors and the record in this case, the trial court did not abuse its discretion when it concluded that the woman's spontaneous comments were an excited utterance. As noted above, the record reveals that police arrived within a couple of minutes of receiving a 9-1-1 report of a male with a shotgun, that the assailant reportedly pointed the shotgun at a woman and ordered her off the corner—a patently startling event—and that she was still visibly shaking and scared when she approached and volunteered information to police. It is significant that only minutes passed between the initial event and the woman's spontaneous comments to police on the scene. *Compare J.A., supra,* 195 *N.J.* at 340-41, 949 *A.2d* 790 (noting that witness who followed attackers and then waited for police "for a few minutes" before making statement "presumably" acted "without having had the 'opportunity to deliberate or fabricate'" (citation omitted)), *with Branch, supra,* 182 *N.J.* at 365-66, 865 *A.2d* 673 (finding statements made to investigator fifteen to twenty minutes after burglary, after seven-year-old had discussed incident with her mother and another officer, were inadmissible). Moreover, the continuous presence of an unsecured, nearby shotgun presented a source of continuing stress to the woman during the intervening moments. *See Buda, supra,* 195 *N.J.* at 297, 949 *A.2d* 761. Accordingly, the trial court acted well within its discretion in finding that the woman's comments constituted an excited utterance.

## II.

The relevant facts relating to defendant's belated *Crawford* challenge are not as clear. My colleagues embrace one account. Other facts in the record are equally important and present a different version.

In particular, Officer Ruocco testified that "immediately upon arrival," an unidentified woman "came right up to me." At the time, he noticed two or three African-American males—defendant and one or two others—in the area of 199 Bidwell. At trial, Ruocco stated that he "*believe[d]*" that Officer Sullivan "went over to . . . Mr. Basil at which time I was approached by a witness"— the woman. (Emphasis added.) Six pages later in the transcript, Ruocco offered somewhat different, more definitive testimony about his partner: Sullivan "was holding Mr. Basil while I was approached by a witness." As to that critical question, my colleagues appear to rely only on Ruocco's latter version—and no other testimony in the record. *See ante* at 578–80, 597–99, 998 A.2d at 476–78, 487–89.

Officer Sullivan, however, provided clearer, direct testimony at trial about what he did:

Q: Can you tell us what happened when you arrived?
A: We arrived on the corner of Bidwell and MLK, and we went to—about maybe twenty yards up from the corner and we saw people walking away from the corner. *A girl came out and pointed and said that's him, he's the one with the gun.*
. . . .
Q: . . . *What did you do then after that, after that statement had been made?*
A: *We told the male to halt* and come here, which he said what do you want me for, like that *and she said that the gun was underneath the car.* So we went over *to him.* We [brought] him over towards the car. He was about ten feet away from the car.[2] We [brought] him over and we told him, you know, let's pat him down, and with that, P.O. Ruocco had him under control.
[(emphasis added).]

Sullivan next testified that another police car arrived, and that he went to the rear of the black Cadillac and found a shotgun underneath the car.

___

[2] It appears that Sullivan was referring to the Cadillac, in that Ruocco testified that the Cadillac was approximately ten feet away from defendant. However, it

In other words, according to Sullivan, whom Ruocco credited with responsibility for controlling defendant, defendant was not restrained until (1) *after* the woman pointed him out and (2) *after* she told police that a shotgun was underneath the car. Only then did police gain control over defendant and the shotgun.

Those differences in the record matter a great deal. I agree with my colleagues that once the police had defendant and the scene under control, the danger that he would grab the shotgun and use it was over. But up until that point, the situation remained an ongoing emergency: a shotgun was loose on a public street, and someone who revealed he might use it was still unrestrained. As a result, the inconsistencies in the record are significant for purposes of a *Crawford* challenge because they mark the line between an ongoing emergency and one that has passed, between addressing a dangerous situation and relaying facts about past events. Those inconsistencies must be resolved to determine whether the witness's hearsay statements are testimonial.

My colleagues ably describe *Crawford* and its progeny, which need not be recapped at length. In short, under *Crawford*, "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford, supra,* 541 *U.S.* at 59, 124 *S.Ct.* at 1369, 158 *L.Ed.*2d at 197. In other words, if a witness does not testify at trial, her

---

is not clear from the transcript precisely where all the principals were located with respect to one another or the Cadillac. We do not know, for example, whether defendant or the police were closer to the shotgun while defendant was free and unrestrained. That information may have been presented to the trial court and jury because, during cross-examination, Sullivan was asked to make notations on a chart and identify where the police car was parked (in the middle of the street), where defendant was standing, and where the woman came from when she approached the police. However, the chart is not part of the record on appeal, and without a clear record, it is difficult to conclude, as my colleagues do, that the danger had passed once the police arrived.

*testimonial* statements are barred under the Sixth Amendment's Confrontation Clause unless they were previously tested by cross-examination, even if those statements would satisfy a hearsay exception. *See id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199; *Buda, supra,* 195 *N.J.* at 304, 949 *A.*2d 761.

Two years later, the Supreme Court clarified the meaning of "testimonial statements" in the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana,* 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006). As the Court explained,

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. [*Id.* at 822, 126 *S.Ct.* at 2273-74, 165 *L.Ed.*2d at 237.]

With those guiding principles in mind, it is essential to return to the facts in the record. When the police arrived on the scene, they knew only of a report of a male with a shotgun at 199 Bidwell Avenue. They did not know which of the two or three men gathered at that location had the weapon or where the gun was. At that moment, assuming that the 9-1-1 call was accurate—as the police were required to do—there was an unsecured shotgun in the vicinity of several unknown males, and someone—who was both unknown and unrestrained—either in possession of or near the weapon. That situation presented an ongoing emergency on a public street. Up until the time defendant was restrained or the shotgun secured, he had the capacity to retrieve the gun and use it; the mere presence of police officers at a distance would not necessarily stop a determined person from acting.

The victim supplied additional information. She related (1) where the gun was—under a Cadillac—and (2) who threw it there after pointing it at her—defendant Basil, who was still nearby.[3]

---

[3] The first statement goes to the existence of an emergency, and the latter to its intensity, which was certainly heightened by the presence of a potential gunman on the scene.

And she gave that information to the police. Only then, according to Officer Sullivan, did the police effectively defuse the ongoing danger. They restrained defendant and retrieved the gun only after hearing the woman's statements. According to Officer Ruocco's conflicting account, Sullivan restrained defendant earlier than that.

If Officer Sullivan's recollection of his own activities is correct, then it would appear that the purpose of the woman's spontaneous statements to police was to enable them to meet an ongoing threat posed by the presumably loaded shotgun and an unsecured assailant who had shown that he might use it against others. On the other hand, if Officer Ruocco's recollection of what Sullivan was doing, while Ruocco was listening to the woman, is accurate, the danger had indeed passed and the woman's statements are more appropriately considered a description of past events for use at a later prosecution.

*Hammon* offers useful guidance on that dichotomy. In *Hammon*, the police arrived on the scene of a completed marital dispute. *Id.* at 819, 126 *S.Ct.* at 2272, 165 *L.Ed.*2d at 235. The alleged assailant, the husband, was in the kitchen; the wife was alone on the porch. *Ibid.* The presence of the police eliminated any emergency from the moment they arrived because they knew who the relevant players were and provided protection by actively separating them. *Id.* at 819–20, 830, 126 *S.Ct.* at 2272, 2278, 165 *L.Ed.*2d at 235, 242. The wife's statements, under the circumstances, recounted past events and were thus testimonial. *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. Imagine, however, if the wife had told police as they approached the house, "My husband just pointed a shotgun at me and has it with him in the kitchen." Like the woman's words in the case before us, that statement might well have been designed to defuse a pending emergency and could have been admissible under *Crawford.* *See id.* at 832, 126 *S.Ct.* at 2279, 165 *L.Ed.*2d at 243.

*United States v. Arnold,* 486 *F.*3d 177 (6th Cir.2007) (en banc), *cert. denied,* 552 *U.S.* 1103, 128 *S.Ct.* 871, 169 *L.Ed.*2d 736 (2008),

is also instructive. In *Arnold,* a visibly shaken and upset victim told police responding to her 9–1–1 call that the defendant had threatened her with a gun and then, when the defendant returned to the scene, exclaimed, "that's him, that's the guy that pulled the gun on me" and "he's got a gun on him." *Id.* at 180. The Sixth Circuit found that the victim's unprompted words both before and after the defendant arrived on the scene were intended simply to get police protection from a man with a gun during a precarious, ongoing emergency. *Id.* at 190–92. The court found that the arrival of the police alone did not end the emergency. *Id.* at 190. As a result, the court concluded that the victim's excited utterances were nontestimonial and therefore admissible. *Id.* at 190–93.

Other state courts have addressed Confrontation Clause issues about the admissibility of victims' statements made to police, which are tied to an existing emergency. *See, e.g., Long v. United States,* 940 *A.*2d 87, 97–98 (D.C.2007) (concluding that victim's statements to police that defendant cut his face, and exclamation "There she is," after spotting assailant, were nontestimonial because they were "frantic," "the situation was uncertain," and "[v]iewed objectively, [the officer]'s questions were designed to find out whether there was any continuing danger and respond to the situation with which he was confronted" (citations omitted)); *State v. Warsame,* 735 *N.W.*2d 684, 692 (Minn.2007) (finding that statements of domestic violence victim to officer that her boyfriend had beaten her, made after victim "left her home and took to the street with injuries at a time when she was in obvious distress and when [her boyfriend] was still at large," were nontestimonial); *State v. Hembertt,* 269 *Neb.* 840, 696 *N.W.*2d 473, 483 (2005) (concluding that statements of upset, crying domestic violence victim that defendant attacked her and threatened her with knife were nontestimonial because they "were not made in anticipation of eventual prosecution, but were made to assist in securing the scene and apprehending the suspect"); *State v. Ayer,* 154 *N.H.* 500, 917 *A.*2d 214, 225 (2006) (finding that inculpatory statements made to police without prompting by defendant's hysterically

crying wife after shooting were nontestimonial because information related to "an armed assailant, who ... was loose, and could have remained in the immediate vicinity or could have gone elsewhere in search of other victims"); *State v. Ohlson*, 162 *Wash.*2d 1, 168 *P.*3d 1273, 1274–75, 1281 (2007) (en banc) (finding that statements taken by police from "upset" and "shaken up" minors five minutes after defendant yelled slurs at them and nearly hit them with his car multiple times were nontestimonial because there was "every reason to believe ... that [defendant] might return" and "situation presented an ongoing emergency" at least until officer "completed her initial triage of the situation").

Those courts "have almost uniformly held that statements made to police officers responding to an emergency call for help were, at the initial stage of the encounter, not testimonial, because they were intended to help officers assess the situation and secure the scene." *Hembertt, supra*, 696 *N.W.*2d at 483 (citations omitted). The Supreme Court anticipated that very outcome in *Davis* and *Hammon* when it observed that officers responding to an emergency "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim ... [which] may *often* mean that 'initial inquiries' produce nontestimonial statements." 547 *U.S.* at 832, 126 *S.Ct.* at 2279, 165 *L.Ed.*2d at 243 (citation and internal quotation marks omitted).

### III.

In the cases discussed above, reviewing courts had the advantage of a clear record. We do not. And it is not appropriate for an appellate court to choose among differing eyewitness accounts contained in a cold transcript. *Robinson, supra*, 200 *N.J.* at 15, 974 *A.*2d 1057; *Elders, supra*, 192 *N.J.* at 243–44, 927 *A.*2d 1250 (stating that in reviewing motion to suppress, "[a]n appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing

court cannot enjoy.'" (quoting *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964))). We did not hear the testimony of Officers Ruocco and Sullivan; the trial court did. The trial judge is therefore in a far better position to evaluate that testimony[4] and answer the pivotal questions raised by defendant's post-trial *Crawford* challenge.[5] I would therefore remand to the trial court to find the relevant facts and apply them to the principles discussed above.

My colleagues suggest that it is too late to remand to the trial court, noting the difficulty of evaluating events more than four years after trial. *See ante* at 603–04, 998 *A.*2d at 491–92. Yet their remedy suggests a double-standard: they would remand for an entirely new trial, nearly five and one-half years after the events in question, even though the relevant facts appear to be in the record.

Ideally, the issue before us should have been sorted out at trial, when memories were fresher, in response to a proper, focused objection. Instead, defendant voiced a hearsay objection to the admission of the woman's statements to the police. He relied on *State v. Alston*, 312 *N.J.Super.* 102, 112, 711 *A.*2d 363 (App.Div. 1998), which held that a detective's "testimony as to the substance of an anonymous phone call was inadmissible hearsay which

---

[4] My colleagues note that "[t]he court found Officer Ruocco's credibility 'to be excellent.'" *See ante* 579, 587, 586–87, 604, 998 *A.*2d at 477, 481, 481–82, 491. The trial court did so in the context of comparing Ruocco's and defendant's testimony at the suppression hearing. At no point did the trial court make a credibility finding on the difference between Ruocco's and Sullivan's trial testimony, which lies at the heart of the *Crawford* dispute.

[5] Because defendant did not raise the *Crawford* issue at trial, review of any error at this point would be for plain error, that is, whether the error was "of such a nature as to have been clearly capable of producing an unjust result." *R.* 1:7–5; *R.* 2:10–2. Moreover, *Crawford* implicates constitutional questions under the Confrontation Clause, so the appropriate plain error analysis would address whether any constitutional error was harmless beyond a reasonable doubt. *J.A.*, *supra*, 195 *N.J.* at 351, 949 *A.*2d 790; *State v. Castagna*, 187 *N.J.* 293, 312, 901 *A.*2d 363 (2006) (quoting *Chapman v. California*, 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 838, 17 *L.Ed.*2d 705, 710 (1967)).

violated [defendants'] Sixth Amendment right to be confronted by the witnesses against them." Defendant even specifically quoted to the trial court a passage from *Alston* decrying the hearsay nature of the testimony in that case. *Id.* at 113, 711 *A.2d* 363. The trial court, however, reminded the parties that he had already found that the statement was an excited utterance—and thus admissible as an exception to the hearsay rule.

Like all hearsay objections, defendant's touched on the Confrontation Clause in that hearsay cannot be cross-examined. Defendant's two-word reference to the Confrontation Clause was offered in that context; it had nothing to do with *Crawford*. *Cf. ante* at 579 & n. 3, 998 *A.2d* at 477 & n. 3. In any event, objections "must be supported by the articulation of specific reasons," *State v. Nelson*, 318 *N.J.Super.* 242, 250, 723 *A.2d* 627 (App.Div.1999) (citation omitted), and no reasons based on *Crawford* were offered until long after the trial ended.

My colleagues conclude that the witness's statements were testimonial and note that reversal would be required, in any event, based on the State's failure to meet its burden of proof as to the statements' admissibility. *See ante* at 596–97, 598–99, 604–05, 998 *A.2d* at 487–88, 488–89, 491–92. That burden is, of course, on the State. But it elevates form over substance to entertain defendant's objection two and one-half years after trial yet not allow a judge to make a finding based on evidence already in the record.

I agree with my colleagues that it is far preferable to have witnesses testify in open court so that they may be subjected to cross-examination. We know from this case, though, that the witness was visibly frightened and refused to give her name or address or get involved further because she was scared for her safety. As this Court recognized last term, "the climate of fear that prevails in some crime-infested neighborhoods [has] undermined law enforcement's ability to prosecute even murder cases." *State v. Byrd*, 198 *N.J.* 319, 340–41, 967 *A.2d* 285 (2009). In such instances, we must turn to New Jersey's *Rules of Evidence* and

cases interpreting the Confrontation Clause to determine what, if any, portion of statements made to police by frightened witnesses may be introduced at trial.

My colleagues take an additional step. They criticize the police by concluding they "chose not to determine the witness's identity." *Ante* at 603, 998 *A.*2d at 491. The record does not support that view. Testimony at the suppression hearing and at trial reveals that the police attempted to get more information from the woman, and tried to get her to speak to detectives and give them a statement, but she refused to cooperate out of fear. It is unrealistic to suggest, as my colleagues do, that police should threaten visibly nervous, shaking witnesses who report violent crimes with arrest on a material witness warrant. *See ante* at 603, 998 *A.*2d at 491. That approach, if not used sparingly, would result in less, not more, cooperation from the public.

For the reasons set forth above, I respectfully dissent from my colleagues' *Crawford* analysis and their rejection of the jury's verdict based on the present state of the record.

Justices RIVERA–SOTO and HOENS join in this opinion.

*For reversal in Part as to parts I, II, and IV of the Opinion*— Chief Justice RABNER and Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—6.

*For affirmance in Part as to part III of the Opinion, the Court being divided*—Justices LaVECCHIA, ALBIN and WALLACE— 3.

*For dissent as to Part III*—Chief Justice RABNER and Justices RIVERA–SOTO and HOENS—3.