# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3080-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

K.D.C.,

     Defendant-Appellant.

_____

Argued December 10, 2019 – Decided February 21, 2020

Before Judges Yannotti and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment Nos. 15-09-1224 and 16-04-0547.

Joseph J. Russo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, on the brief).

PER CURIAM

After the Law Division denied his motion to suppress evidence obtained from a search of his cell phone, defendant pleaded guilty to four offenses, including two counts of first-degree endangering the welfare of a child. Defendant entered the guilty pleas pursuant to a plea agreement, which reserved his right to appeal the denial of his suppression motion.

In September 2017, the court sentenced defendant, consistent with his plea agreement, to an aggregate sentence of twenty-five years with an eighty-five percent period of parole ineligibility. Along with other fines and assessments, the court imposed a $5500 Sex Crime Victim Treatment Fund (SCVTF) penalty. This appeal followed, with defendant challenging the denial of his suppression motion; alternatively, he asserts claims of sentencing error. We affirm, but remand for resentencing on the SCVTF penalty.

We derive the following facts from the testimony elicited at the hearing on defendant's motion to suppress. According to Sgt. Dino Nerney, at approximately 8:20 a.m. on February 19, 2015, defendant's girlfriend (J.C.)[1] arrived at the Jersey City Police Department and reported that, after scrolling through defendant's cell phone, she discovered disturbing videos and

---

[1] We use initials to protect the privacy of the witnesses and other individuals involved.

photographs of small children, whom she recognized as the nieces of defendant's roommate (L.G.). Specifically, she recounted watching a video on defendant's cell phone where defendant pulled the pants down on a child and "fondle[d] her buttocks"; in another video, she observed "the same child on a bed and [defendant] touching her vagina." According to Lt. Honey Spirito of the Special Victims Unit (SVU), J.C. identified defendant in the videos by recognizing his hand and objects in his bedroom.

Lt. Spirito ordered officers to go to defendant's apartment and "check on the welfare of the children, secure the apartment for a search warrant, and to bring the occupants down for an interview." According to Lt. Spirito, the SVU did not prepare an arrest warrant based on an urgent concern for the safety of any children who might be found at defendant's apartment. Sgt. Nerney believed the police had probable cause to prepare an arrest warrant; however, he did not obtain a warrant due to concerns for the children in the video and also because defendant had children of his own living in the apartment.

The building where defendant resided consisted of two apartments. Defendant rented the three-bedroom apartment on the first floor. He lived there with his two children and shared the lease with L.G. According to Sgt. Nerney,

when the police arrived at the apartment, L.G. permitted them inside.[2] After entering the apartment, he told defendant of the allegations of child pornography on his cell phone[3] and asked him and L.G. to drive to the police station for questioning. They both agreed.

Sgt. Nerney testified that Officer Mark Shaver followed defendant to his bedroom, after defendant "asked if he can get some clothes." As defendant entered the bedroom, he started to close the door behind him; at that point, Officer Shaver stepped into the doorway and stopped defendant from closing the door. In response, defendant stated, "You need a search warrant. You can't come in here. And I wanna lawyer."

Sgt. Nerney provided the following explanation for having Officer Shaver follow defendant to his bedroom:

> Well, we didn't check the room [yet]. We don't know if there's kids inside the room, if there's evidence in there, if there's a weapon in there, and we just wanted to make sure that we followed him, you know, to make sure that nothing could be discarded or destroyed.
>
>     . . . .

---

[2]  This statement is consistent with the testimony of L.G., who testified he opened the door to uniformed police officers and permitted the officers inside. Defendant stood next to L.G and did not object to the entry.

[3]  According to L.G., the police did not say why they were there or that they did not have to let them into the apartment.

A-3080-17T1

> [When defendant] stopped [Officer Shaver] from closing the door . . . he was taken into custody at that time.

Defendant then asked Officer Shaver "if he could go back and get his jacket out of his [bed]room." Officer Shaver walked defendant back to the bedroom, where defendant "showed him where the jacket was in the room. He put the jacket on him in the hallway, zippered up the jacket, and then patted him down," locating and removing a cell phone "from the jacket pocket, [a] search incident to arrest."

According to defendant, he opened the door for the police, they came inside and "told me to go to my room and get dressed" because "I was under investigation." He testified the police did not ask if they could enter the apartment and L.G. did not permit them to enter. When defendant went to his bedroom, he tried to close the door and the officer told him, "You cannot close the door." Defendant responded by telling the officer he needed a warrant to come into his bedroom. At that point, the officer placed defendant in handcuffs.

Defendant said the officer told him he "was under investigation, [but] not under arrest." The officer grabbed his coat and put it on him and allowed him to slip on his sneakers. The officers then brought defendant to the common area of the apartment, where they searched him and seized his cell phone. Defendant

5

requested the officers give his cell phone to L.G; instead, they "put it in an evidence bag."

At approximately 11:00 a.m., Officer Mark Sojak spoke to J.C. and obtained the passcode for defendant's cell phone. Officer Sojak accessed defendant's phone using the pattern lock, placed the phone in "airplane mode" and disabled the pattern lock. In a supplemental report, Officer Sojak explained that he wanted to "protect data on the phone" and "prevent anyone from remotely gaining access to the phone to delete any contents of evidentiary value."

At approximately 6:05 p.m., a judge issued a Communications Data Warrant (CDW) for defendant's cell phone. Officer Sojak executed a search of defendant's cell phone, viewed videos of two unknown juvenile victims and located over 1800 images and videos of prepubescent children posing in various sexual positions.

On September 2, 2015, a Hudson County Grand Jury returned a twenty-four-count indictment, charging defendant with three counts of first-degree aggravated sexual assault, three counts of second-degree sexual assault, fourteen counts of third-degree endangering the welfare of a child, three counts of fourth-degree child abuse, and one count of obstruction.

On December 4, 2015, defendant filed a motion to suppress the evidence obtained in his cell phone. At the conclusion of the suppression hearing, the motion judge delivered an oral opinion setting forth her findings and conclusions. The judge found the police arrived at defendant's house "with the intention to investigate[;] first, the information provided [to them, second] to secure the children, if any. And [third t]o secure the premises of the residence to make sure no evidence was destroyed." The judge found either defendant or L.G., or both of them, provided consent to enter because they both conceded in their testimony that consent occurred.

When addressing the conflicting testimony between Sgt. Nerney and L.G. concerning whether police informed defendant why they were at his apartment, the judge found Sgt. Nerney's testimony credible. The judge stated the officers told defendant of the allegations "and asked if [he] would come down to the station to give a statement. Told them briefly about child porn and the defendant's phone. . . . [T]he [c]ourt finds it credible that the [defendant], at least peripherally, was advised as to why they were there."

The judge found defendant not credible when he stated the officer went into his bedroom and began to search against his request. Instead, the judge found:

The more reasonable, and probable, and believable testimony is that the officer did secure the defendant to make sure that he did not destroy the evidence, which [the officer] has every right to do. There is nothing in the case law that suggests that upon receiving consent to enter an apartment, for the purposes of an investigation, that the officers don't have the right to secure the premises that they believe may or may not contain the evidence relative to the allegations contained and received by the officers.

. . . .

[A]t the moment that [defendant] attempted to close the door and refused to step out of the room to allow the premises to be secured for that purpose, and for the officers to secure and make sure that the safety was not an issue, the defendant was obstructing an investigation and, therefore, was appropriately placed under arrest.

Regarding the obstruction charge, the judge found:

And while the defendant was getting his belongings and moving to places where the police officers could not see, and in the room where they believed that the allegations were contained[,] they, at that moment, had a right to secure the premises. And even when the defendant entered the room the officer had a right to make sure that the defendant did not go in to do anything to harm the safety of those involved, including the officers and the children, or to destroy any evidence, because that is the nature of securing a premises. When he did so he interfered with an investigation and . . . performed obstruction, therefore, he was lawfully able to be arrested at that time.

The judge ruled police lawfully searched defendant and lawfully seized his cell phone incident to his arrest. The judge found the initial entry into defendant's phone was "inappropriate at that particular moment" but found no evidence to support the allegation police searched the phone and found information prior to receiving the search warrant. The judge concluded the police executed the CDW lawfully. As a result, she denied defendant's motion to suppress the evidence contained on defendant's phone.

On October 28, 2016, defendant pleaded guilty to two counts of first-degree endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4b(3) (counts five and seventeen) and one count of third-degree endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4b (count twenty three). Defendant also pleaded guilty to one count of second-degree endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4b(5)(a)(i) (count one), stemming from a separate indictment in Hudson County.

On September 15, 2017, defendant received the sentence set forth in his plea agreement. The judge sentenced defendant to an aggregate sentence of twenty-five years of imprisonment with an eighty-five percent period of parole ineligibility. Among other fines, the judge ordered defendant pay a $5500 SCVTF penalty.

9

The judge found aggravating factor three because "[w]hile the defendant does not have any indictable criminal convictions, he has had numerous contacts with the judicial system, both in the State of New Jersey and outside of the State of New Jersey." Additionally, the judge found defendant admitted to engaging in similar acts related to children for a long period of time and defendant did not understand why he engaged in those acts. Therefore, she found defendant had a high probability of committing another offense.

The judge found aggravating factor nine stating "the need to deter this and others . . . specifically from debauching the morals of children by engaging in sexual contact with them at such an early age." The judge further found mitigating factor seven because defendant did not have any prior indictable convictions but did not find mitigating factor eight because of her findings based on aggravating factor three. She concluded the aggravating factors outweighed the mitigating factors.

This appeal followed with defendant presenting the following arguments.

> POINT I
>
> THE ENTRIES INTO DEFENDANT'S APARTMENT AND BEDROOM WERE ILLEGAL, AS WAS DEFENDANT'S ARREST. THE CELL[ ]PHONE WAS A FRUIT OF THOSE UNLAWFUL ACTIONS AND THEREFORE MUST BE SUPPRESSED.

10

A.    The initial entry into the home was illegal because it was not conducted pursuant to valid consent.

B.    The entry into defendant's bedroom was illegal because defendant told officers he did not consent to their entry into his personal living space. Further, the arrest of defendant in his bedroom was illegal.

C.    The phone is a fruit of these unlawful police actions and must be suppressed.

POINT II

DEFENDANT'S SENTENCE IS EXCESSIVE.

I.

Our standard of review on a motion to suppress is limited. State v. Gamble, 218 N.J. 412, 424 (2014). We defer to the trial court's factual findings on the motion, unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention. State v. Elders, 192 N.J. 224, 245 (2007). "Deference to these factual findings is required because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Gamble, 218 N.J. at 424-25 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Our review of the trial court's application of the law to the facts, of course, is plenary. State v. Hubbard, 222 N.J. 249, 263 (2015).

11

A-3080-17T1

Defendant argues police entered his apartment illegally because he did not provide valid consent. Specifically, he argues the police failed to inform him and L.G. that they could refuse their entry. Defendant's argument concerns the distinction in case law between "consent to investigate" cases and "consent to search" cases, with the later set of cases requiring the police to inform homeowners of their right to refuse consent.

Defendant relies on the well settled principle, announced in State v. Johnson, 68 N.J. 349, 354 (1975), that an officer attempting to search a residence by consent must inform occupants that they have a right to refuse the search. However, when the officer's intent is to investigate rather than search the premises, the officer does not have to inform occupants of their right to refuse consent to enter their premises. State v. Padilla, 321 N.J. Super. 96, 108 (App. Div. 1999) aff'd o.b., 163 N.J. 3 (2000); see State v. Williams, 461 N.J. 80, 95-103 (2019) (recognizing and affirming the distinction between consent to enter cases and consent to search cases).

In Padilla, police received an anonymous tip that a person was seen entering a motel room carrying a handgun. Id. at 102-03. The police went to the motel and knocked on the door. Id. at 103. When a woman answered, one of the officers "identified himself and asked if the officers could enter." Ibid.

The woman agreed and opened the door. Ibid. The officers entered and "no one objected." Ibid. One officer observed cash on top of a bag, lifted it and found ammunition. The officer also saw a handgun, picked it up and realized it was loaded. Ibid.

We upheld the denial of the defendant's motion to suppress the evidence found in the motel room. Id. at 107-10. We held that "[a]lthough the unverified facts as described by the caller to the police were insufficient to support the issue of a search warrant, the police had the right, if not the obligation, . . . to investigate the report that a person with a gun was in the motel room." Id. at 107 (emphasis added). Based on the investigation, we found the officers "had the right to knock on the door and identify themselves for the purpose of continuing their investigation and making reasonable inquiries." Ibid.

Importantly, in Padilla this court distinguished its holding from Johnson and reasoned that unlike Johnson "the officers did not seek consent to search. They merely sought permission to enter to continue their investigation." Id. at 108. We found "nothing unreasonable about [the officers'] request for permission to enter the room," and rejected the defendants' arguments that the woman's consent to enter the room was invalid because "the officers did not advise her of a right to refuse to consent." Ibid.

In State v. Pinero, 369 N.J. Super. 65, 68 (App. Div. 2004), investigators went to the defendant's apartment with a warrant; however, they did not notify defendant of the warrant because they were "voluntarily" admitted into the apartment after the investigators said there had been a problem at work. We found "the investigators' entry . . . was the same as that of any other social guest or business visitor, and did not constitute a Fourth Amendment search." Id. at 73. We explained "because all the items were found in areas to which they had been voluntarily admitted by defendant[,]" the "seizure of these items would have been valid even if the investigators did not have a lawfully issued search warrant." Id. at 74.

Here, the judge found the police did not have an obligation to notify defendant and L.G. of their right to refuse consent for them to enter to continue their investigation. The judge further found the police received consent to enter defendant's apartment from either defendant or L.G. Importantly, the judge also found the police had no intention of searching the apartment, did not in fact search the apartment, and intended to secure the premises.

Sgt. Nerney testified that due to the allegations of child pornography on defendant's cell phone, the police intended to go to defendant's home for a welfare check to ensure the safety of defendant's children. The judge found this

testimony credible and found the officers intended to go to defendant's residence to further investigate the allegations of child pornography. We must defer to the judge's findings of credibility that are supported by sufficient credible evidence in the record. Gamble, 218 N.J. at 424-25.

Based on the judge's finding of fact, this case falls within the realm of a "consent to investigate," and the consent the police obtained created a valid entry. Like Padilla, based on the information the police received – regarding the child pornography on defendant's cell phone, the children in the video potentially being in the apartment building, and defendant having young children of his own in the apartment – the officers were obligated to investigate. Further, like Pinero, defendant or L.G. providing police permission to enter made the police analogous to a social guest.

Additionally, like Padilla, there was an ongoing investigation. The police received J.C.'s report early in the morning and after conferring with the SVU, immediately proceeded to defendant's residence. Therefore, the police intended to investigate the allegations of child pornography, and make sure the children in the apartment were safe. We therefore find the police made a lawful entry into defendant's apartment.

Defendant argues the police entry into his bedroom and his subsequent arrest were illegal. He argues that, even if he committed obstruction, "the police cannot enter a private living space to conduct an arrest without a warrant, consent, or exigency, all of which were lacking in this case."

Defendant was originally arrested and charged with fourth-degree obstruction, pursuant to N.J.S.A. 2C:29-1, because he attempted to close the door of his bedroom while under investigation of having child pornography on his cell phone.

"In determining whether there was probable cause to make an arrest, a court must look to the totality of the circumstances and view those circumstances from the standpoint of an objectively reasonable police officer." State v. Basil, 202 N.J. 570, 585 (2010) (citations and internal quotations omitted). The personal observations of law enforcement officers are generally regarded as highly reliable and sufficient to establish probable cause. See State v. O'Neal, 190 N.J. 601, 613-14 (2007); State v. Moore, 181 N.J. 40, 46-47 (2004).

A person who commits obstruction "purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical

interference or obstacle, or by means of any independently unlawful act." N.J.S.A. 2C:29-1(a).

In State v. Crawley, the Court "construe[d] 'lawfully performing an official function' to mean a police officer acting in objective good faith, under color of law in the execution of his duties." 187 N.J. 440, 460-61 (2006). The Court further explained:

> A police officer who reasonably relies on information from headquarters in responding to an emergency or public safety threat may be said to be acting in good faith under the statute. However, a police officer who without any basis arbitrarily detains a person on the street would not be acting in good faith.
>
> [Id. at 461 n.8]

Here, the judge found defendant not credible and found Officer Shaver instructed defendant to get out of his room. When defendant failed to comply and attempted to close the door, he committed obstruction. The judge also determined the police officers were permitted to secure the area for safety purposes and to prevent the destruction of evidence. Thus, the judge reasoned defendant attempting to close his bedroom door when Officer Shaver knew the acts that were being investigated likely occurred in defendant's bedroom, resulted in defendant potentially destroying evidence and obstructing Officer Shaver's investigation.

The record supports the judge's conclusion that defendant violated N.J.S.A. 2C:29-1(a), when he entered his bedroom and attempted to close the door behind him. Like Crawley, the police officers were engaged in a "lawful official function" – investigating an allegation of child pornography and ensuring child safety.

Based on the report J.C. made to the police, they knew the allegations against defendant pertained to child pornography on his cell phone. Officer Shaver observed defendant attempt to isolate himself in the bedroom where the criminal conduct supposedly occurred. Thus, defendant's action constituted a "physical interference or obstacle" by attempting to close the door and conceal his actions from Officer Shaver. As a result, Officer Shaver had probable cause to arrest defendant for obstruction, Basil, 202 N.J. at 585, and acted in good faith pursuant to his duties, Crawley, 187 N.J. at 460-61.

II.

We next address whether the police lawfully seized defendant's cell phone. "Under the search incident to arrest exception, the legal seizure of the arrestee automatically justifies the warrantless search of his [or her] person and the area within his [or her] immediate grasp." State v. Pena-Flores, 198 N.J. 6, 19 (2009) (citing Chimel v. California, 395 U.S. 752, 762-63 (1969)), overruled

18

on other grounds by State v. Witt, 223 N.J. 409 (2015). "The purpose of such a search is (1) to protect the arresting officer from any potential danger and (2) to prevent the destruction or concealment of evidence." State v. Dangerfield, 171 N.J. 446, 461 (2002).

A search incident to an arrest; however, does not authorize a limitless search of the surroundings. In New Jersey, after the defendant "has been arrested, removed and secured elsewhere, the considerations informing the search incident to arrest exception are absent and the exception is inapplicable." State v. Eckel, 185 N.J. 523, 541 (2006). Thus, a reviewing court must "determine, on a case-by-case basis whether [the defendant] was in a position to compromise police safety or to carry out the destruction of evidence, thus justifying resort to the search incident to arrest exception." Ibid.; see also State v. Oyenusi, 387 N.J. Super. 146, 155 (App. Div. 2006), certif. denied, 189 N.J. 426 (2007).

As noted, we conclude Officer Shaver lawfully arrested defendant for obstruction, pursuant to N.J.S.A. 2C:29-1. Additionally, the judge ruled the police lawfully searched defendant incident to that arrest. Once Officer Shaver escorted defendant into the hallway and placed him under arrest, the police granted defendant's request to retrieve his jacket from his bedroom. After

placing the jacket on defendant, police then searched him, and found his cell phone in a jacket pocket. We agree with the judge that the search was justified to prevent the destruction of evidence and was a lawful search incident to arrest. Eckel, 185 N.J. at 541.

Defendant argues the evidence obtained from defendant's cell phone requires suppression because the cell phone "was found in the apartment the police had no right to be, was retrieved from a jacket in the bedroom the police had no right to be and found during a search incident to arrest the police had not right to conduct."

In Riley v. California, 573 U.S. 373, 403 (2014), the Supreme Court held arresting officers violated the Fourth Amendment when they made a warrantless search of data stored on an individual's cell phone incident to a lawful arrest. The defendants conceded the officers could have seized and secured their cell phones to prevent the destruction of evidence while seeking a warrant. Id. at 388. The Court also addressed the concerns about destruction of evidence and found:

> Remote wiping can be fully prevented by disconnecting a phone from the network. There are at least two simple ways to do this: First, law enforcement officers can turn the phone off or remove its battery. Second, if they are concerned about encryption or other potential problems, they can leave a phone powered on and place

A-3080-17T1

it in an enclosure that isolates the phone from radio waves.

[Id. at 390.]

We agree with the judge that the initial entry into the cell phone – placing the cell phone in airplane mode and then disabling the lock on the cell phone – was unlawful. However, we also agree with the judge that police obtained no information from the entry into the cell phone. By placing the cell phone into airplane mode and disabling the lock, the police did not obtain any "data stored" on defendant's cell phone, which as explained in Riley, constitutes a Fourth Amendment violation.

Defendant did not argue the police obtained evidence during the initial entry into his cell phone. The cell phone itself cannot be suppressed because police seized it during a lawful search incident to arrest and no data was taken during the unlawful entry. Police obtained a CDW to search the data and contents of defendant's cell phone that stored the evidence resulting in defendant's charges. Defendant does not challenge the CDW or subsequent search of his cell phone. Therefore, we agree with the judge that the police did not obtain any data as the result of a fourth amendment violation.

A-3080-17T1

We next address whether the judge abused his discretion when sentencing defendant. Defendant argues he received an excessive sentence, claiming the trial court erred in finding aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant would commit another offense) and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the need for specific and general deterrence). Specific to aggravating factor nine, defendant claims the judge did not explain why there was a need for specific deterrence. In the same vein, defendant argues the court failed to consider his young age (he was twenty-seven years old when he committed his offenses).

"Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The sentence must be affirmed, unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We "may not substitute our judgment for that of the trial court." State v. Natale, 184 N.J. 458, 489 (2005) (quoting State v. Evers, 175 N.J. 355, 386 (2003)). Thus, we must affirm the defendant's sentence, even if this court would have arrived at a different result, as long as the trial court properly identified and balanced the aggravating and mitigating factors. Ibid.

The judge found aggravating factor three because defendant confirmed at trial he engaged in similar conduct related to young children for a number of years and could not explain why. Therefore, the judge reasoned it was likely defendant would be a repeat offender. She found aggravating factor nine because the need to deter defendant and society as a whole was significant.

We see no reason to disturb the judge's sentencing on this issue. The judge clearly considered all applicable mitigating and aggravating factors and provided adequate reasons for her findings, based on credible evidence in the record.

Defendant further argues the judge failed to "make the proper findings before imposing the maximum SCVTF penalty of $5500." We agree.

In State v. Bolvito, 217 N.J. 221, 231 (2014), the Court explained that a sentencing court may impose a SCVTF penalty in any amount between the nominal and upper limit prescribed by N.J.S.A. 2C:14-10(a), and that the court

has "substantial discretion with respect to the amount of the SCVTF penalty." Id. at 231. In making that determination, a sentencing "court should begin by considering the nature of the offense when determining a defendant's SCVTF penalty within the statutory range." Id. at 233-34.

When setting an SCVTF penalty, courts "should consider the defendant's ability to pay the amount assessed." Id. at 234. "If a substantial penalty is assessed against a defendant who has no realistic prospect of satisfying it, that penalty is destined to become an unsatisfied judgment . . . ." Ibid. In determining a defendant's ability to pay, "the sentencing court should look beyond the defendant's current assets and anticipated income during the period of incarceration." Ibid. Upon sentencing, the "court should provide a statement of reasons when it sets a defendant's SCVTF penalty within the statutory parameters," which "will apprise the parties, the victim, and the public and will facilitate appellate review." Id. at 235.

In this case, the judge failed to provide any reasons for the amount of the penalty imposed. Given the $5500 amount, the judge also should have provided an assessment of defendant's ability to pay the large penalty. We therefore remand to the sentencing court to reconsider the imposition of the SCVTF

penalty and provide a statement of reasons, including an assessment of defendant's ability to pay, explaining the final amount imposed.

Affirmed, but remanded for resentencing limited to the issue of the SCVTF penalty. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3080-17T1