**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0502-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LONNIE L. WILKERSON,
a/k/a LONNIE GRANT,
MARK HAIRSTON,
LONNIE HURST,
MARK WALKER, and
LONNIE WILKINSON,

     Defendant-Appellant.

_____

Submitted February 26, 2024 – Decided July 24, 2024

Before Judges DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-08-2187.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Kevin S. Finckenauer, Assistant Deputy Public Defender, of counsel and on the briefs).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Lonnie L. Wilkerson appeals from the July 13, 2022 order of the Law Division denying his motion to suppress a handgun and controlled dangerous substances (CDS) found on his person when he was stopped by police. We affirm.

I.

On July 9, 2021, a caller to 9-1-1 had the following exchange with a Camden police dispatcher, from which non-relevant material has been redacted:

| | |
|---|---|
| Caller: | I'm on 7th and Chestnut. This guy is driving around with a gun in his car and he's threatened to shoot me with his gun. |
| Caller: | He's just a black, bald-headed guy. |
| Caller: | His first name they say is Lonnie and his last name is Wilkerson, Lonnie Wilkerson. |
| Dispatcher: | And what is he doing out there? |
| Caller: | He's driving around with a gun in his car, threatening to shoot me. |
| Dispatcher: | What's the color and make of the vehicle? |

2

Caller:           (inaudible) wearing sweatpants with a t-shirt and –

Dispatcher:       Ma'am, what is the color and make of the vehicle, ma'am?

Caller:           The vehicle is a red, four-door – it's red, four-door vehicle and on the side of it, it has, like, a red – it's like a grey paint, it's like – the door is messed up on the side.

Dispatcher:       On the driver's side or the other –

Caller:           Yes, yes, it's on the driver's side.

Dispatcher:       What type of weapon did you see?

Caller:           He has a – I think it's – like a glock.

Dispatcher:       It's a handgun?

Caller:           Yes, yes.

Dispatcher:       Where is he at now?

Caller:           Down on 7th and Chestnut.

Dispatcher:       He's just parked there on 7th and Chestnut?

Caller:           And he's got, like, a – yes and he's got a silver necklace around his neck.

Dispatcher:       Is there anybody else in the vehicle with him?

3

Caller: I don't know – I think it's a girl that's in the vehicle with him.

Dispatcher: And what's he shooting at?

Caller: He's – trying to shoot me with his gun.

Dispatcher: He was trying to or he did?

Caller: No, he did not shoot me with his gun. He was trying to shoot me.

Dispatcher: What's your first name? I have officers coming out there.

Caller: [Jane J-A-N-E.] And my last name is [Doe].[1]

Dispatcher: What is a cell number to reach you at, ma'am?

Caller: At this phone (inaudible) because I'm on my friend's phone.

Dispatcher: Confirm the cell number for me please, ma'am.

Caller: I don't know this number by heart. I (inaudible) this phone.

This information was transmitted to officers, including Officer Tran, who was in the area of Seventh and Chestnut Streets. Within five to ten minutes of

_____

[1] We use a pseudonym to protect the identity of the caller.

4

the call, Tran, in a marked patrol car, located a vehicle meeting the description provided by the caller parked on the side of the road. The officer observed defendant, whose appearance and clothing matched the description provided by the caller, exit the vehicle and sit on a crate against a building. Tran observed defendant blade his body when he walked away from the vehicle, which Tran, consistent with his training and experience, interpreted as an attempt to conceal a weapon or ammunition under his clothing.

Tran, along with Officer Ramos, approached defendant, who was sitting with his back against a brick wall talking on his cellphone. The officers repeatedly instructed defendant to stand up. Defendant repeatedly did not comply. The officers then lifted defendant to a standing position. On the recording made by one officer's body worn camera, the handle of a gun protruding from the waistband of defendant's sweatpants is readily apparent when he stands up. In addition, the recording depicts a plastic bag tied to defendant's sweatpants.

The officers placed defendant in handcuffs, secured his cellphone, removed the gun from his pants, and conducted a pat down. An later inspection of the plastic bag revealed CDS.

5

A grand jury subsequently indicted defendant, charging him with: (1) second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); (2) second-degree possession of a weapon during a drug offense, N.J.S.A. 2C:39-4.1(a); (3) third-degree possession of fentanyl, N.J.S.A. 2C:35-10(a)(1); (4) third-degree possession of fentanyl with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(5); (5) third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1); (6) third-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3); and (7) second-degree certain persons not have weapons, N.J.S.A. 2C:39-7(b)(1).

Defendant moved to suppress the evidence obtained as a result of the stop. Defendant argued the officers unlawfully arrested him without probable cause prior to patting him down. In the alternative, defendant argued that if the officers' interaction with defendant prior to the pat down did not constitute an arrest, they lacked reasonable, articulable suspicion to conduct an investigative stop and pat down.

The court held a hearing, at which Tran and an investigator retained by defendant testified. Tran described his encounter with defendant as detailed above. He acknowledged that the person who called 9-1-1 was not on scene when he arrived.

6

The investigator testified that she was tasked with determining whether she could connect the telephone number from which the 9-1-1 call was made to the name that the caller provided to the dispatcher. During an investigation conducted almost a year after the incident, the witness was unable to confirm that the phone number belonged to a person with the name reported to the dispatcher. She was not able to determine the name of the person to whom the number was assigned. The court also viewed the officers' body worn camera recordings and listened to an audio recording of the 9-1-1 call.

At the conclusion of the testimony, the court issued an oral opinion denying defendant's motion. The court found both witnesses provided credible testimony. The court concluded that "[n]o case law [exists] suggesting law enforcement must wait and research the veracity of a 911 caller who identifies herself by name before taking an affirmative action to investigate the claims or allegations provided by such a caller suggesting a person is armed and dangerous." The court found that the caller sounded excited and did not appear to be someone calling 9-1-1 merely to provide information to the police about defendant.

The court concluded:

> [c]onsidering the presumption that an identified 911 caller's report to police carries sufficient reliability for

A-0502-22

police investigatory action, I find the police actions here, namely respond[ing] to the location where a particularized person operating a specific motor vehicle is in possession of a handgun, has behaved threat[ing]ly, justifies the initial police contact with this defendant.

Here, the officers received dispatched information that a 911 caller who identified herself as [Jane Doe] stated that a black male, who is identified as Lonnie Wilkerson, had in his possession a handgun. The caller described in detail the male's attire and further advised he was riding around the area with a handgun trying to shoot her. The caller provided a detailed description of the vehicle and the location where it was parked.

When police arrived at the location provided by the caller, they were able to corroborate the information received from the caller, specifically they observed a vehicle and an individual, both meeting the descriptions given by the caller. These specific and articulable facts have the indicia of reliability and provide the officers reasonable suspicion that the defendant was engaged or about to engage in criminal conduct and therefore provided [a] basis . . . for the police to stop defendant and investigate.

After finding that the investigative stop was lawful, the court addressed the officers' pat down of defendant:

Here, when defendant noticed the approaching officers, he bladed his body . . . away from them. This evasive action suggested to police, and Officer Tran testified to this, the defendant was attempting to conceal something on his person, possibly a weapon as reported by the 911 caller.

8

Based upon the specific information received from the 911 caller and corroboration [of] that information is discussed supra, the officer had a reasonable basis to believe defendant was armed and dangerous. On the totality of the circumstances, officers were lawfully justified in asking the defendant to stand up to conduct a Terry pat-down or frisk of the outer clothing in an attempt to discover weapons.

The court concluded that the officers were justified in handcuffing defendant, given his refusal to abide by their multiple requests for him to stand up, and that this did not convert the encounter into an arrest. The court also found that the body worn camera recording of one of the officers clearly depicted the butt of a handgun protruding from defendant's sweatpants when he was made to stand up. The court further concluded that once the handgun was discovered, the officer had probable cause to arrest defendant and search his person, including the plastic bag tied to his pants, incident to arrest. A July 13, 2022 order memorializes the trial court's decision.

Defendant subsequently pleaded guilty to second-degree possession of a handgun. The court sentenced defendant to a five-year term of imprisonment, with a mandatory-minimum of forty-two months pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

This appeal followed. Defendant makes the following arguments.

POINT I

OFFICERS LACKED PROBABLE CAUSE TO ARREST MR. WILKERSON AT THE TIME THE GUN WAS RECOVERED. BECAUSE MR. WILKERSON WAS UNDER A DE FACTO ARREST WHEN THE POLICE SEARCHED HIS PANTS AND SEIZED THE GUN, THE GUN AND ALL SUBSEQUENTLY OBTAINED EVIDENCE MUST BE SUPPRESSED.

POINT II

EVEN IF THE OFFICERS' ACTIONS DID NOT AMOUNT TO AN ARREST, THEY OTHERWISE LACKED REASONABLE, ARTICULABLE SUSPICION TO STOP AND SEARCH MR. WILKERSON.

## II.

The federal and this State's constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. An investigatory stop or detention, sometimes referred to as a Terry[2] stop, involves a temporary seizure that restricts a person's movement. A Terry stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Elders, 192 N.J. 224,

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

A-0502-22

247 (2007) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). The State has the burden to establish that a stop was valid. State v. Mann, 203 N.J. 328, 337-38 (2010); State v. Pineiro, 181 N.J. 13, 20 (2004). If there was no reasonable suspicion of criminal activity to justify the stop, evidence discovered as a result of the stop is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). Investigative stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." State v. Davis, 104 N.J. 490, 505 (1986).

> A [judge] must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." "[A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a [judge] must determine whether the evidence "raise[s]

a suspicion that the particular individual being stopped is engaged in wrongdoing."

[Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original) (citations omitted).]

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Elders, 192 N.J. at 243 (quotations omitted). We disregard only those findings that "are clearly mistaken." State v. Hubbard, 222 N.J. 249, 262 (2015). We review legal conclusions of the trial court de novo. State v. Watts, 223 N.J. 503, 516 (2015).

We begin our analysis with the reliability of the report of the 9-1-1 caller. "Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster." State v. Basil, 202 N.J. 570, 586 (2010). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. This is so because "we assume that an ordinary citizen 'is motivated by factors that are consistent with law enforcement goals,'" ibid. (quoting Davis, 104 N.J. at 506), and thus may be regarded as trustworthy. State v. Hathaway, 222 N.J. 453, 471 (2015). Information received from a

12

citizen "concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." Ibid. (quoting Davis, 104 N.J. at 506).

In each of these precedents, our Supreme Court found that the anonymous report of criminal activity by an ordinary citizen, when considered in context with other facts, was sufficient to give law enforcement personnel authority to enter a premises under the emergency aid exception to the warrant requirement, see State v. Frankel, 179 N.J. 586, 598 (2004), effectuate an arrest based on probable cause, or conduct a Terry stop. A critical element of the Court's analysis in each case was that the citizen reported criminal acts based on personal knowledge.

For example, in Basil, the victim of a crime, who refused to identify herself out of fear for her safety, approached an officer when he arrived at the scene and said that Basil had pointed a shotgun at her before tossing the weapon under a nearby car. 202 N.J. at 587. Her statement was based on "information from her personal knowledge regarding events that occurred minutes earlier." Ibid. "Importantly, the young woman's reliability was immediately corroborated by the discovery of the shotgun in the precise location where she said it was

discarded." Ibid. The Court found that the citizen's corroborated report gave the officer probable cause to arrest Basil. Ibid.

Similarly, in Hathaway, at approximately 4:00 a.m., the "animated" and "upset" victim of an armed robbery approached casino security personnel and reported that he had been robbed at gunpoint and forced to disrobe in his hotel room. 222 N.J. at 461. A few minutes later, the victim left the casino without revealing his identity. Ibid. The security official viewed a surveillance video that confirmed that the victim had arrived at a specific hotel room with two men and two women, and left alone in what appeared to be a panic shortly before giving his report of having been robbed. Id. at 462. The security official relayed this information, and his observation that the gunmen and two women may still be in the room, to a law enforcement officer. Ibid. The Court found that the officer had no objectively reasonable basis to doubt the victim's report, id. at 476, and an objectively reasonable basis to believe that an emergency required him to enter the hotel room without a warrant. Id. at 476-79.

In Davis, a member of the local first aid squad called 9-1-1 to report that he observed two men on bicycles "hanging around" a closed gas station just before midnight. 104 N.J. at 494. Based on that information, an officer, who found no one at the gas station, searched for the suspects in his patrol car. Id.

14

at 495. About three blocks from the station, the officer encountered two men on bicycles riding against traffic, whom he stopped pursuant to Terry. Ibid. Ultimately, the two men admitted that they had stolen the bicycles. Id. at 496. The Court found that a member of a first aid squad "while not part of the government, is more involved and presumably more public spirited than the average citizen." Id. at 506. Thus, the Court found, "[t]he police could . . . rely on him as a credible source of information." Ibid. The Court concluded the report "furnished [a] sufficient basis for the police to investigate whether criminal activity had occurred or was about to occur," justifying a Terry stop. Ibid.

We have carefully considered the record in light of these precedents and find no basis on which to disturb the trial court's denial of defendant's motion to suppress. Here, a citizen called 9-1-1, identified herself, and, in what the trial court found to be an excited state, reported her first-hand account of defendant threatening her with a gun. She provided defendant's name and described his appearance, the car he was driving, the clothes he was wearing, and the area in which the gunpoint threats took place.

Tran promptly responded to the area and found a car matching the description given by the caller. While awaiting backup officers, Tran, sitting in

A-0502-22

a marked patrol car parked across from the vehicle, observed a man meeting the physical description provided by the caller and wearing clothing matching the description provided by caller, exit the vehicle. The caller's information was, therefore, corroborated. Importantly, before exiting his patrol car, the officer observed the man blading as he exited his vehicle. The officer explained that this behavior is indicative of an attempt to hide a weapon in the person's clothing.

We agree with the trial court that, interpreting in an objectively reasonable manner all of the information available to Tran when he stopped defendant, the officer had articulable suspicion that criminal activity had occurred or would shortly occur prior to him effectuating the stop. The officer's investigative stop of defendant was, therefore, constitutionally sound.

Our conclusion is not changed by the fact that police did not attempt to confirm the identity of the 9-1-1 caller. Neither the federal nor this State's constitution requires police officers to confirm the reliability of a citizen who reports a first-hand account of criminal activity that recently took place and which threatens public safety before responding to the scene and conducting a Terry stop of a person meeting the description provided by the caller. Such a standard would be unworkable and a threat to public safety. This is particularly

16

true where, as is the case here, the officer made observations that corroborated the caller's report and saw the suspect act in a manner indicative of criminal behavior before conducting the stop.

We are not persuaded by defendant's argument that the trial court erred when it determined the officers did not effectively place defendant under arrest prior to conducting the pat down. The body worn camera recordings, which we reviewed, depict defendant resisting the officers' requests that he stand up so they could conduct an investigative stop. In light of defendant's lack of cooperation, it was reasonable for the officers to grab his arms, make him stand up, and handcuff him for their safety while they conducted the stop and pat down.

We also agree with the trial court's conclusion that once the officers discovered the handgun in defendant's pants during the pat down, they had probable cause to arrest him. After they arrested defendant, the officers conducted a lawful search incident to arrest which uncovered the CDS in defendant's possession.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-0502-22